1                 UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
2                      WACO DIVISION

3   IMPULSE DOWNHOLE              ) Docket No. WA 19-CA-378 ADA
    SOLUTIONS, LTD.               )
4                                 )
    vs.                           ) Waco, Texas
5                                 )
    RUBICON OILFIELD              )
6   INTERNATIONAL HOLDING, LLC ) March 6, 2020

7

                    TRANSCRIPT OF MARKMAN HEARING
8           BEFORE THE HONORABLE ALAN D. ALBRIGHT

9

10  APPEARANCES:

11  For the Plaintiff:        Mr. Aaron Fountain
                              Mr. John M. Guaragna
12                            DLA Piper, LLP
                              401 Congress Avenue, Suite 2500
13                            Austin, Texas 78701

14

15  For the Defendant:        Mr. Brian C. Nash
                              Mr. Steven P. Tepera
16                            Pillsbury, Winthrop,
                              Shaw, Pittman, LLP
17                            401 Congress Avenue, Suite 1700
                              Austin, Texas 78701
18

19

20  Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
21                            Austin, Texas 78701
                              (512)391-8792
22

23

24

25  Proceedings reported by computerized stenography,
    transcript produced by computer.

09:22:06 1        THE CLERK:  Court calls Waco case:  19-CV-378,

09:22:11 2   Impulse Downhole Solutions, Limited vs. Rubicon Oilfield

09:22:15 3   International Holdings, LLC, for a Markman hearing.

09:22:17 4        THE COURT:  Counsel, if you would stand up and

09:22:19 5   announce for the record.  Mr. Guaragna.

09:22:21 6        MR. GUARAGNA:  Good morning, your Honor.

09:22:23 7        John Guaragna for the Plaintiff Impulse.  With me

09:22:26 8   today is my partner, Aaron Fountain.  The two of us will

09:22:29 9   be splitting up the terms, the argument today.  Also, our

09:22:32 10  associate, Zac Loney, is here.

09:22:33 11       THE COURT:  Most importantly.

09:22:35 12       MR. GUARAGNA:  Leader of our time, Ms. Lineberry

09:22:37 13  is also here with us today.

09:22:38 14       THE COURT:  The finest paralegal ever.

09:22:42 15       MR. GUARAGNA:  We agree, your Honor.

09:22:43 16       THE COURT:  And Mr. Nash, who's sporting a lovely

09:22:46 17  beard.

09:22:50 18       MR. NASH:  Thank you, your Honor.  I've been

09:22:50 19  working on it quite a bit.

09:22:52 20       Brian Nash of Pillsbury here on behalf of

09:22:55 21  Rubicon.  I'm joined by my colleague, Steven Tepera, as

09:22:59 22  well as Sarah Goetz is in the audience.  And our client is

09:23:01 23  also here with us today, Sue Kean of Rubicon.

09:23:04 24       THE COURT:  Very good.  Thank y'all for being

09:23:06 25  here.  You may be seated.

09:23:12   1          MR. GUARAGNA:  Your Honor, excuse me, before we

09:23:13   2   proceed, we have a couple of copies of our presentation,

09:23:15   3   if I could hand those up.

09:23:16   4          THE COURT:  Perfect.

09:23:25   5          MR. GUARAGNA:  We included an extra copy of the

09:23:27   6   patent, your Honor.

09:23:27   7          THE COURT:  Okay.  Perfect.

09:23:29   8          MR. NASH:  I'll approach, if that's okay, your

09:23:32   9   Honor, too, so you'll have them.

09:23:33  10          THE COURT:  Sure.  And you all should notice that

09:23:42  11   my favorite clerk is sitting in front of me.  He's -- we

09:23:48  12   are trying someone new out on these patent cases, so we'll

09:23:51  13   see how Austin does.

09:23:58  14          Okay.  I think I'm in the right order.  If I'm

09:24:04  15   not, let me know.  I think the first claim term to take up

09:24:07  16   is a cyclic, which is C-Y-C-L-I-C for the court reporter,

09:24:15  17   polyrhythmic, which is P-O-L-Y, and then, rhythmic,

09:24:22  18   R-H-Y-T-H-M-I-C, pattern.  Is that what you all have as

09:24:25  19   the first claim term as well?

09:24:27  20          MR. GUARAGNA:  It is, your Honor.

09:24:28  21          MR. NASH:  Yes, your Honor.

09:24:29  22          THE COURT:  And let the record reflect that I

09:24:32  23   came out before the hearing started and let the parties

09:24:36  24   know that the opening thought of the Court for a

09:24:41  25   construction for this claim term, which I would like --

09:24:45 1 I'm going to hear from the parties on, would be two or

09:24:50 2 more different rhythms within one revolution of the

09:24:55 3 flowhead wherein a rhythm refers to either varying

09:25:01 4 amplitude or duration between pressure peaks.

09:25:04 5 Mr. Fountain.

09:25:07 6 MR. FOUNTAIN: Thank you, your Honor.

09:25:25 7 THE COURT: Yes, sir.

09:25:26 8 MR. FOUNTAIN: May it please the Court. Aaron

09:25:28 9 Fountain on behalf of Plaintiff Impulse Technologies.

09:25:35 10 By way of brief introduction, your Honor, the 584

09:25:41 11 patent is generally directed to a downhole tool that

09:25:44 12 produces a vibration pattern that can improve a drilling

09:25:48 13 operation. The basic components of that tool are a motor,

09:25:51 14 a flowhead, and a flow restrictor. The flowhead rotates,

09:25:56 15 and the flow restrictor as well as the flowhead each have

09:25:59 16 a plurality of ports as that flowhead rotates. The ports

09:26:04 17 move into in and out of alignment, and that alignment and

09:26:07 18 misalignment is what causes the cyclic polyrhythmic

09:26:12 19 pattern that your Honor wants to hear about.

09:26:15 20 Now, the specification discusses the cyclic

09:26:20 21 polyrhythmic pattern discussed in the 584 patent by

09:26:24 22 reference to prior art fluid pressure patterns. They are

09:26:29 23 criticized in the technical background section of the

09:26:32 24 specification as adversely affecting measurement while

09:26:35 25 drilling or survey equipment mounted in the drilling

09:26:40 1  stream.  Now, I think a full discussion of measurement

09:26:43 2  while drilling apparatus is beyond the scope of this claim

09:26:46 3  term, but very briefly, it's a method by which fluid

09:26:49 4  pressure pulses are used by equipment down in the drilling

09:26:53 5  hole to send information back up through the drill stream

09:26:56 6  to the surface.

09:26:58 7          And what the specification says is that the

09:27:01 8  polyrhythmic pressure peak pattern resulting from the

09:27:04 9  embodiments and suitable variations discussed in the 584

09:27:08 10  patent can reduce that interference or damage caused to

09:27:13 11  other MWD or survey equipment.

09:27:15 12          Now, there's no suggestion in this patent that

09:27:20 13  the benefits of the polyrhythmic pattern can only be

09:27:25 14  realized with respect to a single rotation of the

09:27:28 15  flowhead.  And, in fact, the benefits from the lack of

09:27:31 16  interference between the claimed cyclic polyrhythmic

09:27:35 17  pattern and the pressure pulses used by MWD and survey

09:27:40 18  equipment is equally realizable over multiple rotations of

09:27:45 19  the flowhead.

09:27:49 20          THE COURT:  I think we agree with you on that.

09:27:52 21          MR. FOUNTAIN:  Thank you, your Honor.

09:27:56 22          Now, we've considered your Honor's suggested

09:28:04 23  construction at this point, and what I'd like to do is

09:28:08 24  walk through why we believe that the inclusion of one

09:28:12 25  rotation of the flowhead and your Honor's suggested

09:28:15  1  construction is not appropriate in review of the intrinsic

09:28:20  2  record of the 584 patent.  And then, I would like to end

09:28:23  3  by briefly discussing your Honor's construction after I've

09:28:28  4  proceeded, if that's all right.

09:28:30  5        THE COURT:  Well, let me ask you this.  If it's

09:28:32  6  not within one revolution, then where is the polyrhythmic

09:28:38  7  pattern?

09:28:39  8        MR. FOUNTAIN:  So I think the best way to

09:28:42  9  consider that, your Honor, would be --

09:28:43 10        THE COURT:  And I'll tell you -- I'm sorry to

09:28:45 11  interrupt you, but I'll tell you, that's -- I think,

09:28:47 12  unless my clerks tell me I'm wrong.  You know, we spent a

09:28:51 13  lot of time trying to get this one claim term correct.

09:28:55 14  And I think that was -- my question to you is one of the

09:28:58 15  things that we particularly struggled with and we think

09:29:01 16  has to be reflected in the construction.

09:29:05 17        MR. FOUNTAIN:  Understood, your Honor.

09:29:09 18        And I think that where we start would be with the

09:29:14 19  understanding of a person of ordinary skill in the art

09:29:16 20  that encounters these terms, "cyclic polyrhythmic

09:29:20 21  pattern."  Right?  The basic components of that claim

09:29:22 22  term, "cyclic" and "poly," have a well-understood meaning

09:29:27 23  to a person of ordinary skill in the art, a jury.

09:29:31 24  "Cyclic" simply refers to repeating.  And "poly" refers to

09:29:36 25  more than one.  Rubicon has never disputed that those are

09:29:40 1 accurate descriptions of the plain meaning of those parts.

09:29:45 2 And this court and the Federal Circuit has held

09:29:47 3 that when the component parts of a claim term are well

09:29:51 4 understood, that a POSITA can infer the meaning of the

09:29:56 5 entire claim term from those parts. And I think we look

09:29:58 6 at the Bancorp case, it's pretty helpful for how the

09:30:03 7 analysis should proceed here, and that is the term in

09:30:06 8 Bancorp was surrender value, protected investment,

09:30:11 9 credits.

09:30:12 10 And when the Court looked to construe that term,

09:30:14 11 they looked at the first part, surrender value, and said,

09:30:17 12 look, a person of ordinary skill in the art understands

09:30:19 13 what that part means. And then, for the protected

09:30:23 14 investment and the credits part, the Court looked to the

09:30:26 15 specification and saw how those terms were used, and put

09:30:29 16 all that together and concluded that the plain and

09:30:33 17 ordinary meaning of that term would be readily understood

09:30:36 18 by a person of ordinary skill in the art. We think that's

09:30:38 19 exactly the approach that should be followed here; and

09:30:41 20 then, when that approach is followed, the inclusion of one

09:30:45 21 rotation of the flowhead within the construction of cyclic

09:30:49 22 polyrhythmic pattern cannot be correct.

09:30:51 23 So very briefly, your Honor, I'd like to look at

09:31:00 24 the specification's use of polyrhythmic. Polyrhythmic is

09:31:05 25 used in a way that is similar to, if not interchangeable

09:31:09 1  with, complex rhythmic.  It appears two times in the

09:31:14 2  specification.  And a complex rhythmic pattern is

09:31:18 3  distinguished from a simple rhythmic pattern.  And in the

09:31:22 4  same way, a polyrhythmic pattern is distinguished from a

09:31:25 5  single rhythmic pattern.

09:31:34 6          And here is the answer to your Honor's specific

09:31:37 7  question.  If the pattern is not observed in a single

09:31:40 8  rotation of the flowhead, where does that pattern exist?

09:31:46 9  Impulse's expert, Dr. Sharma, looked to the teachings of

09:31:50 10 the specification and concluded that a person of ordinary

09:31:53 11 skill in the art would understand from the specification

09:31:57 12 that a cyclic polyrhythmic pattern can exist across

09:32:01 13 multiple rotations of the flowhead.

09:32:04 14         And the way that that works is, the specification

09:32:07 15 teaches that the motion of the rotor -- and it's a little

09:32:13 16 bit hard to see, but the way these motors are set up is

09:32:17 17 that there's a centerpiece that's shown as kind of an

09:32:20 18 elongated oval there called a rotor, and then, it rotates

09:32:24 19 within a stator, which is the outer part that has the

09:32:27 20 somewhat triangular cutout in the middle.

09:32:29 21         And the specification says that a person of

09:32:32 22 ordinary skill in the art understands that that geometry

09:32:35 23 when that rotor rotates, it also moves eccentrically.

09:32:41 24 That is, as it spins, it walks around in a geometric shape

09:32:46 25 within the confines of the stator.  And the shape that it

09:32:49  1  takes when it does that is the dependent on the ratio of

09:32:53  2  the lobes of the rotor to the number of lobes of the

09:32:58  3  stator.

09:32:58  4        And so, if you have two lobes on a rotor and

09:33:01  5  three lobes on a stator, as shown in figure 7, that

09:33:04  6  walking about of the rotor as it rotates is going to be

09:33:08  7  roughly triangular in shape.  Similarly if you had a

09:33:15  8  three-four ratio where the rotor had three lobes and a

09:33:19  9  stator had four lobes, then that walking-about motion of

09:33:23  10  the end of the rotor is going to be roughly square in

09:33:25  11  shape.

09:33:27  12        Now, the specification explains that a person of

09:33:31  13  ordinary skill in the art would have that understanding.

09:33:33  14  The specification also says that the motion of the rotor

09:33:38  15  is transferred to the flowhead.  Now, what Dr. Sharma

09:33:43  16  explained is that when you have that configuration where

09:33:45  17  the eccentric motion of the rotor is transferred to the

09:33:49  18  flowhead, that the flowhead will move in that eccentric

09:33:53  19  shape of the rotor, and as it spins, what you get is

09:33:58  20  something that came to a spirograph child's toy in that

09:34:03  21  you have a pattern that develops, and the pattern itself

09:34:05  22  rotates as you move from cycle to cycle.

09:34:09  23        And so, what that creates, if you're thinking

09:34:11  24  about the ports of the flowhead and the ports of the flow

09:34:14  25  restrictor is that as the flowhead rotates, it's going to

09:34:19 1 move around relative to the stationary flow restrictor

09:34:23 2 such that the alignment of the ports in a second rotation

09:34:26 3 will not be the same as the alignments of the ports in the

09:34:30 4 first rotation.

09:34:31 5 And if you look at figure 8, what you see is that

09:34:34 6 a pattern begins to develop as this rotates over and over

09:34:37 7 and over again. And so, the cyclic notion of the

09:34:41 8 polyrhythmic pattern, according to this specific teaching

09:34:45 9 of the specification, is going to be that the pattern will

09:34:49 10 emerge over successive rotations of the flowhead.

09:34:52 11 Importantly, Rubicon's expert does not dispute

09:35:00 12 that that's how this works. Right? What Rubicon's expert

09:35:05 13 said is, look in this embodiment, if you proceed down in

09:35:09 14 the specification, there are additional features, a

09:35:12 15 universal adapter, a radial bearing, that limit the motion

09:35:17 16 of the flowhead so that it cannot walk around with the

09:35:21 17 rotor as it spins.

09:35:23 18 Importantly, that's clearly an example

09:35:26 19 embodiment. The specification just says in this example,

09:35:29 20 and it goes on to recite the universal adapter and the

09:35:33 21 radial bearing. And those are components that are

09:35:37 22 separately claimed independent claims. I believe it's

09:35:41 23 dependent claim 10 recites the radial bearing, and

09:35:48 24 dependent claims 14 and 35 create the universal adapter.

09:35:53 25 So according to the basic teaching of the specification,

09:35:55  1  when the eccentric motion is imparted to the flowhead, the

09:35:59  2  flowhead will walk around and create a repeating pattern

09:36:03  3  of varying pressure pulses across successive cycles of the

09:36:08  4  flowhead's rotation.

09:36:10  5          So that's my answer to where is the pattern

09:36:17  6  observed if it's not within one rotation of the flowhead.

09:36:22  7  Now, Rubicon's supposed textual hook for why we have to

09:36:29  8  look at one rotation of the flowhead to find the cyclic

09:36:33  9  polyrhythmic pattern is that the specification includes a

09:36:35  10  definition of a different word, "cycle."  Now, these words

09:36:40  11  are similar.  They share a prefix, but they don't mean the

09:36:43  12  same thing in ordinary parlance, and there's nothing in

09:36:47  13  the 548 pattern to suggest otherwise.

09:36:49  14          The specification never provides a definition of

09:36:54  15  cyclic.  And the definition of cycle that Rubicon relies

09:36:57  16  on appears in a different context.  The phrase "cyclic

09:37:00  17  polyrhythmic pattern" does not appear in the specification

09:37:03  18  passage that Rubicon points to for its definition of the

09:37:07  19  different word "cycle."

09:37:11  20          And if we look at the claims, we see that the

09:37:15  21  claims fully support this understanding that the word

09:37:19  22  "cycle" is not the same as the word "cyclic."  Independent

09:37:24  23  claim 26, which is not asserted in this case, cites at the

09:37:28  24  first full limitation, the drilling fluid varies in a

09:37:32  25  cyclic polyrhythmic pattern.  Dependent claim 27 further

09:37:38  1   limits the pattern to say that it includes at least one

09:37:42  2   interval in its cycle where the flow of the drilling fluid

09:37:46  3   is substantially stopped.  That that language there, "at

09:37:50  4   least one interval in its cycle," is where Rubicon takes

09:37:53  5   its supposed definition, but claim 27 includes the word

09:37:58  6   "cyclic" and to the word "cycle" by virtue of its

09:38:02  7   dependence on claim 26.  Different claim terms mean

09:38:05  8   different things that's consistent with the plain meaning

09:38:08  9   of those words and as shown here in the relationship

09:38:11  10  between claims 26 and 27.

09:38:12  11       THE COURT:  Let me ask you this.  Because your

09:38:16  12  presentation is very good and you're helping me understand

09:38:19  13  this a little better than I had understood it before.

09:38:26  14  With respect to the proposed construction that we gave

09:38:30  15  you, are you -- and this isn't, you know -- I want you to

09:38:36  16  protect your record, and if you disagree with all of it,

09:38:40  17  you tell me you disagree with all of it.

09:38:44  18       But my sense is what you are telling me is that

09:38:48  19  the part of it that you disagree with primarily is the

09:38:51  20  words "within one revolution."

09:38:55  21       MR. FOUNTAIN:  That's correct, your Honor.

09:38:56  22       THE COURT:  And so, if we were to the change the

09:39:01  23  words "within one revolution" in the proposal that I gave

09:39:06  24  you to the words "across cycles" and it were to read, two

09:39:12  25  or more different rhythms across cycles of the flowhead

09:39:17  1   wherein a rhythm -- you know the rest of it -- would that

09:39:22  2   satisfy you all?  Would that satisfy the plaintiff?

09:39:32  3        I'm trying to summarize in a workable way what

09:39:34  4   you -- I think I -- first tell me if what I'm trying to

09:39:38  5   get to takes into consideration what you are saying we had

09:39:45  6   -- in a gracious way, you said we had gotten wrong.  And

09:39:48  7   so, that's what I'm -- and then I'm, of course, going to

09:39:51  8   give Mr. Nash an opportunity to work on -- or, you know,

09:39:58  9   I've been handed a note, another possibility would be as

09:40:02  10  opposed to "within one revolution" to say "within one

09:40:07  11  cycle."

09:40:10  12        Is that something you could live with?

09:40:12  13        MR. FOUNTAIN:  Let me take the second one first,

09:40:14  14  your Honor.

09:40:14  15        THE COURT:  Okay.

09:40:15  16        MR. FOUNTAIN:  The answer to your question

09:40:17  17  regarding the second proposal is definitely no.

09:40:20  18        THE COURT:  Okay.

09:40:21  19        MR. FOUNTAIN:  Because the specification, I

09:40:22  20  agree, does define cycle as one revolution of the

09:40:24  21  flowhead.  So that would be swapping out sort of larger

09:40:26  22  words for a single word that's defined to mean the larger

09:40:30  23  thing that I find objection to.

09:40:32  24        THE COURT:  Okay.  So you would not want --

09:40:34  25  doesn't mean you won't get it.  But I'm just trying to get

09:40:38 1    this right.

09:40:39 2         MR. FOUNTAIN:  Understood, your Honor.

09:40:40 3         THE COURT:  And so, you vote no on "within one

09:40:44 4    cycle."  What about two or more different rhythms across

09:40:48 5    cycles of the flowhead?

09:40:49 6         MR. FOUNTAIN:  So I think that scope needs to be

09:40:52 7    included in the term "cyclic polyrhythmic pattern" for the

09:40:55 8    reasons that I've been trying to articulate as we've gone.

09:40:59 9    The problem I have with that construction is that it would

09:41:03 10   not be satisfied by some of the preferred embodiments in

09:41:08 11   the specification, which I agree do show multiple peaks at

09:41:11 12   different amplitudes or durations within a single cycle.

09:41:15 13        THE COURT:  That's the problem we're having.  You

09:41:16 14   put your finger on exactly the problem we had in coming up

09:41:19 15   with the correct construction for -- that we've been

09:41:22 16   wrestling with was, what -- I compared it earlier to, I

09:41:27 17   think we all know what it looks like to see someone using

09:41:30 18   a Hula Hoop.  But if one were to try and claim how one did

09:41:35 19   it, what words would you use so everyone understood what

09:41:39 20   that meant?

09:41:40 21        And so, you just put your finger on why we've

09:41:45 22   been wrestling so hard to come up with the right language

09:41:47 23   because we understand that issue, and we want to make sure

09:41:51 24   that that's accurate.  But we found, for example, you

09:41:54 25   know, your proposal -- your proposed word "repeating" is

09:41:59  1  not necessarily constrained to a -- you know, something

09:42:03  2  happens more than once might be repeating, but might not

09:42:05  3  be what the patent does in the same way that, you know, we

09:42:11  4  were coming up with a number of words, iterative.  We

09:42:16  5  struggled -- we spent a lot of hours on this trying to get

09:42:21  6  it right.

09:42:23  7          And so, take -- if my proposal and if you say you

09:42:33  8  just can't work with it at all, let me know.  But is there

09:42:37  9  something you would do -- you would amend?  Is there a way

09:42:41  10  you would amend mine so I could -- let me -- why don't you

09:42:44  11  do that, tell me what you would do to amend mine.  And

09:42:46  12  I'll hear from Mr. Nash and he can -- we can keep trying

09:42:50  13  to work this out.

09:42:51  14          MR. FOUNTAIN:  Thank you, your Honor.

09:42:53  15          I think one proposal, it's a little awkward and

09:42:56  16  it doesn't normally fit with how we like to do claim

09:43:00  17  construction or how courts seem to prefer to do claim

09:43:03  18  construction, but, you know, you could say, two or more

09:43:05  19  different rhythms within one or more revolutions of the

09:43:08  20  flowhead.  That captures the single revolution and the

09:43:10  21  multiple revolution example explained by Mr. Sharma.

09:43:13  22          What Mr. Guaragna and I discussed, before your

09:43:18  23  Honor came out and took the bench, would be crossing out

09:43:24  24  the "within one revolution of the flowhead" and using what

09:43:28  25  we believe to be the better meaning of cyclic as it

09:43:32 1 appears in the 584 patent specification to be a

09:43:38 2 construction along the lines of a repeating pattern of two

09:43:41 3 or more different rhythms wherein a rhythm refers to

09:43:47 4 either varying amplitude or duration between pressure

09:43:51 5 peaks.

09:43:51 6          And the reason why I think that is a good

09:43:53 7 proposal is that that pattern can repeat across multiple

09:43:57 8 rotations of the flowhead.  It can repeat within a single

09:44:01 9 rotation of the flowhead.  But the basic explanation of

09:44:04 10 what's going on here, I think, is fairly captured by what

09:44:07 11 we've proposed as an adjustment to your Honor's tentative

09:44:11 12 construction you gave us at the beginning.

09:44:15 13          THE COURT:  Well, and I'm not saying it's the

09:44:19 14 construction I would adopt, but the proposal that you have

09:44:23 15 made, certainly the first part of it -- and I was one of

09:44:30 16 the ones arguing on this side when we were discussing it

09:44:33 17 is, it's -- what you are proposing certainly reflects

09:44:39 18 pretty much what the language says of a cyclic

09:44:44 19 polyrhythmic pattern where -- and what we're trying to

09:44:46 20 define there of what rhythm means.

09:44:50 21          Again, the issue being whether -- we had a great

09:44:56 22 debate whether the word "repeating" was the right -- was

09:45:00 23 the correct word or not.

09:45:02 24          MR. FOUNTAIN:  I think it flows straight from the

09:45:14 25 -- so I think it flows straight from the plain and

09:45:18  1  ordinary meaning of the word "cyclic," your Honor.  It's

09:45:20  2  plain and ordinary meaning that's never been disputed and

09:45:22  3  we think that it is -- is consistent.  If you think about

09:45:25  4  how this tool operates, right, that flowhead, it spins,

09:45:30  5  and Rubicon's expert does explain it in a different

09:45:33  6  context that this thing spins at a rate of something like

09:45:36  7  ten revolutions per second.  And you're drilling thousands

09:45:40  8  of feet of downhole space and that this thing just

09:45:45  9  continues to rotate.

09:45:47  10      And whether the pattern repeats over a very

09:45:51  11  narrow or very short span as it rotates within a single

09:45:57  12  rotation of the flowhead, if it has a lot of ports such

09:46:00  13  that you get the pattern beats repeatedly within a single

09:46:04  14  rotation, that's fine.  If the pattern has fewer ports and

09:46:08  15  relies on this eccentric motion transferred from the rotor

09:46:15  16  in order to start to get that repetition over multiple

09:46:18  17  cycles of the flowhead, that's fine.

09:46:20  18      But there's no language in this patent that says

09:46:23  19  you have to have one or you have to have the other.  And,

09:46:30  20  in fact, if your Honor will indulge me one more slide

09:46:33  21  before you invite Mr. Nash up, I think the patent

09:46:36  22  explicitly teaches that you have to have this term broad

09:46:40  23  enough to cover both the examples.

09:46:41  24      THE COURT:  I'm writing what you're saying down.

09:46:42  25  Give me one second to do that.  I'm writing down what you

09:46:46 1    propose.

09:46:58 2            And now that I've looked at your counterproposal

09:47:01 3    as it were, why does the Court need to swap out the word

09:47:10 4    "repeating" for "cyclic" at all?

09:47:14 5            MR. FOUNTAIN:  If I understand your question,

09:47:16 6    your Honor, are you asking whether we might also be okay

09:47:19 7    with a cyclic pattern of two or more different rhythms --

09:47:23 8            THE COURT:  Yes.

09:47:24 9            MR. FOUNTAIN:  -- followed by -- I think that

09:47:25 10   would be fine, your Honor.  As I've said, I think

09:47:28 11   repeating and cyclic are the same thing.

09:47:29 12           THE COURT:  Yes.  That was my question.  So did

09:47:35 13   you have anything else you wanted to say?

09:47:37 14           MR. FOUNTAIN:  If I might show your Honor more

09:47:38 15   slide before Mr. Nash comes up.

09:47:39 16           THE COURT:  You can do whatever you'd like.

09:47:42 17           MR. FOUNTAIN:  I certainly have more I can say,

09:47:43 18   but I think we're on a productive line of interaction

09:47:45 19   here.

09:47:46 20           THE COURT:  Why don't we limit it -- I'll modify

09:47:49 21   that in the future.  Do you have anything -- I'll say that

09:47:51 22   every time from now on:  Do you have anything else

09:47:53 23   productive that you might want to say?

09:47:55 24           MR. FOUNTAIN:  I believe I do, your Honor.

09:48:00 25           THE COURT:  Tell me which slide you're on,

09:48:02  1    please.

09:48:05  2              MR. FOUNTAIN:  The big screen says one, but I

09:48:07  3    know that's not right.  Slide 12, your Honor.

09:48:11  4              THE COURT:  Okay.  Thank you.

09:48:13  5              MR. FOUNTAIN:  So this is where I think that the

09:48:17  6    sort of breadth of the term "cyclic polyrhythmic pattern"

09:48:22  7    really becomes very, very clear.  And, you know, I think

09:48:27  8    that there's a little bit of a fuzzy area around what's

09:48:32  9    the plain and ordinary meaning of a claim term.  But

09:48:36 10    there's one articulation in Phillips that I think is

09:48:39 11    particularly appropriate here, and that is the ordinary

09:48:41 12    meaning of a claim term is its meaning -- is its ordinary

09:48:46 13    meaning to the skilled artisan after reading the entire

09:48:51 14    patent.

09:48:51 15              Right.  So I realize that the question we're here

09:48:53 16    to address is what does cyclic polyrhythmic pattern mean.

09:48:57 17    But once the person of ordinary skill in the art reads

09:48:59 18    this patent, they'd have to conclude that it's broad

09:49:01 19    enough to include both a pattern that exists within one

09:49:05 20    rotation and a pattern that exists across multiple

09:49:08 21    rotations.  And the reason for that is very

09:49:10 22    straightforward.

09:49:11 23              On the left of the slide, we see -- this slide

09:49:16 24    has two separate descriptions of the cyclic polyrhythmic

09:49:21 25    pattern.  They're both introduced in exactly the same way.

09:49:24 1  There's a paragraph that describes an embodiment or aspect

09:49:27 2  of the invention and concludes by reciting a cyclic

09:49:31 3  polyrhythmic pattern.  And the very next paragraph in both

09:49:35 4  excerpts begins, in one aspect, the pattern comprises, and

09:49:41 5  then, it includes two different descriptions.

09:49:44 6          So because the specification uses the term

09:49:47 7  "cyclic polyrhythmic pattern" in a very general way to

09:49:51 8  introduce two different descriptions, whatever it means, a

09:49:55 9  person of ordinary skill in the art would conclude that

09:49:57 10 the term has to be broad enough to encompass both

09:50:00 11 descriptions.

09:50:03 12         And what we have underlined on the right is the

09:50:06 13 language from which Rubicon plucked its construction and

09:50:09 14 the language from which Rubicon plucked this idea that a

09:50:13 15 cyclic polyrhythmic pattern has to be limited to a single

09:50:16 16 rotation of the flowhead.  The first underlined example is

09:50:21 17 referring to peaks of varying amplitude.  The second

09:50:24 18 underlined example is referring to peaks of varying

09:50:27 19 duration between them.

09:50:29 20         But, importantly, a similar discussion of peaks

09:50:34 21 of varying amplitude and peaks with varying duration

09:50:38 22 between them appears in the specification passage on the

09:50:40 23 left.  That passage makes no mention of within a single

09:50:45 24 revolution of the flowhead.  So if the Court were to adopt

09:50:50 25 Rubicon's construction or the initial construction that

09:50:55  1  your Honor suggested we consider, it would exclude the

09:50:58  2  description of the cyclic polyrhythmic pattern on the

09:51:02  3  left-hand side of slide 12.  There's no principle basis

09:51:07  4  for doing so.

09:51:07  5          As I've said, the plain and ordinary meaning of

09:51:10  6  cyclic is merely repeating, and that's a meaning that

09:51:13  7  makes this claim term broad enough to encompass both

09:51:16  8  examples which are clearly within the scope of the term as

09:51:21  9  it's used in the specification.

09:51:33 10          May I do one more, your Honor?

09:51:35 11          THE COURT:  Whatever you'd like.

09:51:37 12          MR. FOUNTAIN:  Thank you.

09:51:38 13          Now, the passage on the left throughout the

09:51:44 14  stages of briefing was largely unaddressed, if not

09:51:48 15  entirely unaddressed, by Rubicon's brief.  We pointed it

09:51:53 16  out in our opening brief that, hey, you've got two

09:51:56 17  separate descriptions of cyclic polyrhythmic pattern, they

09:51:59 18  both have to be included, and Rubicon's brief pretty much

09:52:01 19  ignored the one on the left.

09:52:04 20          And by their reply brief, what they said is,

09:52:07 21  well, the one on the left has the word "cycle" in it;

09:52:11 22  therefore, the entire thing is limited to one rotation of

09:52:15 23  the flowhead.  But that makes no sense if you look at this

09:52:19 24  language.  Right?  What we're looking at is, it says, the

09:52:22 25  pattern comprises at least one interval in its cycle.  And

09:52:28  1   if that's supposed to modify the varying amplitude and the

09:52:33  2   varying peak duration spacing, it simply doesn't work

09:52:37  3   because both of those have a plurality of fluid pressure

09:52:40  4   peaks.  You cannot have a plurality of fluid pressure

09:52:45  5   peaks at one interval of the rotation of the flowhead.

09:52:50  6   You would need at least two intervals of the rotation of

09:52:55  7   the flowhead to have a plurality of peaks.

09:52:58  8          So the inclusion of the word "cycle" in the

09:53:02  9   left-hand passage does not support in any way that that

09:53:05  10  entire passage needs to be understood as limited to one

09:53:12  11  rotation of the flowhead.

09:53:12  12         THE COURT:  Got it.

09:53:13  13         MR. FOUNTAIN:  Thank you, your Honor.

09:53:18  14         THE COURT:  Mr. Nash, at the risk of messing up

09:53:21  15  your presentation, why don't you pick up and respond to

09:53:25  16  the argument that he just made and then, jump back to

09:53:28  17  wherever it was you were going to go with.  For purposes

09:53:32  18  of the record, I'm at page 12 of the plaintiff's

09:53:36  19  PowerPoint.

09:53:39  20         MR. NASH:  Yes, happily, your Honor.  And, in

09:53:40  21  fact, if it's okay, I'll leave this up there for purposes

09:53:43  22  of discussion.  I have my own slides, but this one's very

09:53:46  23  pretty and I think it works just fine.

09:53:48  24         THE COURT:  Just like you.  Very pretty and works

09:53:51  25  just fine.

09:53:53 1          MR. NASH:  You're too kind, your Honor.  Thank

09:53:54 2     you so much.

09:53:54 3          We do actually address this.  I think counsel

09:53:57 4     mentioned that we largely ignored it.  It's one of the

09:54:01 5     pieces of evidence that we cited in our opening brief and

09:54:03 6     we relied on that throughout our briefing.  And he is

09:54:06 7     correct in how we've described that.  It's consistent with

09:54:08 8     our construction.  Our construction would not exclude it.

09:54:11 9          I should just back up.  I'm saying our

09:54:14 10    construction.  We're actually 100 percent in agreement

09:54:17 11    with your Honor's preliminary instruction or construction

09:54:20 12    for this term, and we'd be absolutely fine with that.  We

09:54:22 13    think that's very consistent with what we've argued in our

09:54:26 14    briefing.

09:54:26 15         So with respect to this statement, now this comes

09:54:28 16    from column 3, there's the statement that you see there,

09:54:31 17    column 2.  There's also a similar statement in column 3,

09:54:34 18    as well.  Each of these, we believe, is quasi definitional

09:54:38 19    in the sense that there's a statement about the cyclic

09:54:40 20    polyrhythmic pattern, and then, directly following that,

09:54:42 21    there's a description of what that pattern would comprise.

09:54:45 22         On the one at the right, we do see an express

09:54:49 23    explanation of what constitutes a cycle.  So it says,

09:54:52 24    within a single revolution of the flowhead, and plaintiffs

09:54:56 25    have underlined that in red up here on the right.  They

09:54:58  1  don't do a similar thing.  "They," meaning the patentees

09:55:01  2  in this context over here on the left.  Instead, they just

09:55:04  3  use the same word again, which is "cycle."  You see that

09:55:07  4  saying, in one aspect, the pattern comprises at least one

09:55:10  5  interval in its cycle.

09:55:12  6          So they simply just happen to repeat the word

09:55:16  7  "cycle" there.  It's not as helpful in understanding what

09:55:18  8  constitutes a cyclic polyrhythmic pattern because they

09:55:21  9  just repeated the word.

09:55:22  10         I'd like to respond, I guess, briefly to

09:55:25  11  counsel's statement that you cannot have a plurality in

09:55:28  12  one interval, and we disagree with that statement, your

09:55:32  13  Honor.  I think what that's saying is that within a cycle,

09:55:37  14  you may also have an interval.  And I guess I don't think

09:55:40  15  we need to start construing the word "interval," but an

09:55:42  16  interval would be a subset of that cycle, in which case,

09:55:46  17  you would have a plurality of pressure peaks with

09:55:48  18  different amplitudes or plurality of pressure peaks with

09:55:50  19  varying time intervals within that interval.  So it's just

09:55:53  20  narrowly saying you could also have a subset of a cycle

09:55:57  21  that also has this polyrhythmic behavior.

09:55:59  22         Does that answer your Honor's question?

09:56:01  23         THE COURT:  It does.  I assume your client,

09:56:05  24  Rubicon, would not be in agreement with the proposal that

09:56:09  25  the plaintiff made?

09:56:10 1    MR. NASH:  No, we would not, your Honor.  We

09:56:12 2 think there's a very big problem with expanding the

09:56:15 3 meaning of cyclic beyond the context that the patentees

09:56:17 4 intended.

09:56:18 5    THE COURT:  And you also would not want the

09:56:20 6 change to be made from within one revolution to across

09:56:25 7 cycles.

09:56:26 8    MR. NASH:  That's correct, your Honor.  We think

09:56:27 9 that's a similar expansion.  It's taking the meaning out

09:56:30 10 of cyclic the patentees intended and turning it into just

09:56:33 11 at some point in time effectively that there is a

09:56:37 12 repetition of multiple patterns.

09:56:40 13    THE COURT:  Okay.

09:56:45 14    MR. NASH:  If you'll give me a moment, I think my

09:56:48 15 laptop might have fallen asleep on us.

09:56:52 16    THE COURT:  Okay.

09:56:59 17    MR. NASH:  So, your Honor, there's three aspects

09:57:01 18 of plaintiff's presentation.  Actually, well, I had, four,

09:57:04 19 but we just addressed one of them.  But I wanted to kind

09:57:06 20 of make sure I focused on what they argued so that I could

09:57:08 21 respond to that.

09:57:12 22    First, I think in their slide 7, they contend

09:57:17 23 that there's a plain and ordinary meaning.  And, in fact,

09:57:21 24 I don't want to use their slides, but I do have this in

09:57:23 25 front of me.  On slide 7, they've offered up a couple of

09:57:26　1　definitions:  One is cyclic and one is for polyrhythmic.

09:57:29　2　Actually checked that, it's for the word "poly," and you

09:57:31　3　can see that on the right-hand side of their slide.

09:57:33　4　　　　　I thought it might make sense to start there

09:57:37　5　because they're contending that there's some kind of

09:57:40　6　ordinary meaning, but they didn't ever really do that in

09:57:42　7　their briefing nor did they present any evidence to

09:57:45　8　support that.  So these definitions that we see in the

09:57:49　9　slides, these are here for the first time now today.

09:57:51　10　That's not something that they relied on in their

09:57:53　11　briefing.

09:57:53　12　　　　　So if you look back at their opening brief, I

09:57:56　13　think it's at page 18 of their opening brief, that's where

09:57:59　14　they discuss their construction.  It's one paragraph and

09:58:03　15　there's not a single citation to the evidence, whether

09:58:06　16　intrinsic, extrinsic, or otherwise.  So they don't really

09:58:09　17　have evidence or arguments supporting this repeating

09:58:13　18　construction that they've offered.  And I think the reason

09:58:16　19　why this is so important here is because this was a unique

09:58:18　20　term that was coined by the inventors.  And specifically,

09:58:23　21　they introduced this for the first time in the context of

09:58:24　22　this art and they defined cyclic, and I think that's where

09:58:28　23　the dispute lies.

09:58:28　24　　　　　So I'm going to try and go to the parts of the

09:58:31　25　specification that are discussing cyclic, and we can see

09:58:33  1  how the patentees used it here.  So to begin, there's a

09:58:37  2  general description of the patent.  We've talked about

09:58:39  3  this a little bit in the context of columns 2 and 3.  This

09:58:42  4  was where there's a general description of what it means

09:58:44  5  to have a cyclic polyrhythmic pattern.  And we see right

09:58:47  6  there in that definitional statement, in addition to the

09:58:49  7  other aspects of your Honor's construction, the word

09:58:53  8  "cyclic" is being interpreted to mean or being defined to

09:58:56  9  mean a single revolution of the flowhead.

09:58:58  10  So we see that in both this statement from column

09:59:00  11  2 as well as the statement from column 3.  And then, that

09:59:04  12  same understanding is reinforced and further clarified in

09:59:08  13  the context of the description of the preferred

09:59:10  14  embodiments.  So I'd like to look at figure 8 because I

09:59:14  15  think figure 8 in the embodiment reflected there is very

09:59:16  16  instructive.

09:59:16  17  THE COURT:  And we've gone over -- I want you to

09:59:19  18  say whatever you want to say but we've -- my clerks and I

09:59:23  19  have gone over figure 8 with me pretty extensively.

09:59:27  20  MR. NASH:  Yeah.  I won't belabor it any further,

09:59:29  21  your Honor.  I do think that figure 8 very important

09:59:31  22  because there's three aspects of it I'd like to point out

09:59:34  23  real quick.

09:59:34  24  THE COURT:  Sure.

09:59:35  25  MR. NASH:  So in the beginning for column 8, it

starts talking about figure 8 and that embodiment and talks about figure A -- figure 8A, and in doing so, the patentees have an express definition of cyclic. And this is pretty blackletter patent law, when you used the word "i.e.," it's a definition: That is. And so, it's saying cycle is one full rotation of the flowhead.

And then, that's reinforced later in the description of figure 8B. Now, I'm sure your Honor learned in studying this, figure 8B is reflecting various instances over the course of one full rotation. And it says in describing figure 8B that what is being depicted here is different rotational positions of the flowhead in a single cycle. So in this context, it's very clear what a single cycle is. It's zero to 360 degrees, and it illustrates that repeatedly. So you see that we've got zero, 50, 60, 120, 180, 240, 300. So that's a cycle according to this figure.

And then, there's this great callback in column 10. And I love column 10 because I think it's the best description of it what is to be like polyrhythmic. And I think to the extent there's a purported invention here, this is where the patentees describe it. They talk about the ports and how they come into and out of alignment that creates polyrhythmic behavior.

THE COURT: Which page are you on?

10:00:56  1          MR. NASH:  If you go to column 10 and I believe
10:00:59  2     it's lines 33 to 45.  Oh, sorry.  What slide am I on, your
10:01:03  3     Honor?  Slide 10.  Okay.  So I think this is an important
10:01:13  4     callback right here.  In the context of describing
10:01:16  5     polyrhythmic behavior, they take a break in the middle of
10:01:20  6     column 8 or, sorry, column 10, and they say, hey, remember
10:01:23  7     figure 8B where we were discussing it.  Yeah, that was a
10:01:26  8     cycle and that's a cycle period, zero to 360 degrees.
10:01:29  9          And you see I've highlighted that here on the
10:01:32  10    slide in blue.  It says, it will be appreciated by those
10:01:34  11    skilled in the art that over one revolution of the
10:01:37  12    flowhead, not only will the time interval between adjacent
10:01:40  13    fluid pressure peaks vary, but the magnitudes vary.  And
10:01:43  14    that's our definition of polyrhythmic right there.  It's
10:01:45  15    what the patentees told us first in columns 2 and 3.  And
10:01:48  16    now they've reenforced it in the context of this
10:01:51  17    embodiment that that cyclic aspect of it is one revolution
10:01:55  18    of the flowhead.
10:01:56  19          And I thought I'd show this earlier part here on
10:02:01  20    slide 11 of column 10.  I've got a lot of highlighting
10:02:05  21    here, but the bottom part, I think, is important where you
10:02:08  22    see the words "the polyrhythmic, although cyclic," and you
10:02:14  23    see that in a parenthetical, "although cyclic."  And I do
10:02:17  24    think that's important because what I think the patentees
10:02:19  25    are trying to say with that parenthetical, the word

10:02:22  1  "although" is, look, you could have polyrhythmic behavior.

10:02:26  2  Maybe you have it in a minute, maybe you have in it in

10:02:28  3  five minutes, maybe you have it over the course of an

10:02:31  4  hour.  But they're saying it's not just it being

10:02:33  5  polyrhythmic but it being polyrhythmic and cyclic, meaning

10:02:37  6  that it has to take place within a cycle.  And that's

10:02:41  7  referencing back to their definitional statement that a

10:02:44  8  cycle is one revolution of the flowhead.

10:02:45  9         And that's really important here because that's

10:02:47  10  what they've taught.  They've taught how to create a port

10:02:50  11  design that will create a polyrhythmic pattern in one

10:02:52  12  cycle over one revolution.  And I think they've reinforced

10:02:55  13  that throughout the specification as well as that

10:02:57  14  definitional statement.

10:03:02  15         So I thought if we go back to slide -- their

10:03:13  16  slide 7.  Actually, one of the things I wanted to address,

10:03:18  17  your Honor, they say that cycle does not equal cyclic, and

10:03:24  18  they say that over and over again.  I'm not really sure

10:03:25  19  what their basis for arguing that is.  I mean, I agree

10:03:28  20  that those are two different words, but cyclic means based

10:03:32  21  on a cycle, right?

10:03:33  22         And, in fact, if you looked at their slide 7,

10:03:35  23  they've offered this definition.  Again, the definition

10:03:37  24  wasn't in the record and wasn't in the briefing, but I'm

10:03:40  25  looking at it right now.  It says, of or relating to or

10:03:44  1  characterized by cycles or, B, recurring or moving in

10:03:49  2  cycles.  So the word "cyclic" actually does embrace and

10:03:54  3  require there be some amount of cycle.

10:03:57  4          You have to have and define a cycle, right?  It's

10:03:59  5  not just repeating.  Repeating's a broader word that means

10:04:03  6  it happens more than once.  But cycle or cyclic, cyclic

10:04:07  7  means it has to take place within a defined period.

10:04:10  8  That's what a cycle is.  It's a defined period.  So you've

10:04:13  9  got this seasonal cycle, that's a defined period.  In this

10:04:16  10  context and in the context of this patent, the patentees

10:04:19  11  have defined what a cycle is, and they've said that it is

10:04:21  12  one revolution of the flowhead.

10:04:23  13          If it would be helpful, your Honor, I could

10:04:33  14  address the eccentric motion aspect.  I think that that's

10:04:36  15  been a little interesting or confusing to me because

10:04:41  16  counsel mentioned that this is a statement that comes from

10:04:44  17  the specification, and to be honest, your Honor, I'm not

10:04:51  18  seeing it.  The figure that counsel had up here when it

10:04:54  19  was -- I believe it's slide 9 from their slides and in

10:04:59  20  which case, they say Rubicon does not dispute Dr. Sharma

10:05:01  21  's description.  I do take issue with that.  We do dispute

10:05:04  22  that one.

10:05:05  23          Our expert has his own explanation of what

10:05:09  24  eccentric motion means.  And, in fact, what our expert

10:05:11  25  says is, people skilled in the art certainly were aware of

10:05:15  1    eccentric motion.  It was something that they were trying

10:05:17  2    to eliminate from these type of tools.  And this is what I

10:05:20  3    think's important when we take a look at what the

10:05:22  4    specification actually teaches.  So that's this column up

10:05:24  5    here on the left.  No.  That's not that column.  Where do

10:05:32  6    we have that?  Sorry.

10:05:34  7         Oh, right.  That's -- I think we've talked about

10:05:38  8    that.  Let me go ahead to here.

10:05:43  9         THE COURT:  Slide 23.

10:05:44  10         MR. NASH:  Slide 23.  And, your Honor, I

10:05:46  11   apologize, this is in the context of another claim.  But

10:05:49  12   in this claim term, the eccentric motion thing came up

10:05:52  13   quite a bit, so that's where we've discussed it in our

10:05:54  14   slide deck.  But it's -- they don't typically show us all

10:05:58  15   of what's being discussed here.  But here's that

10:06:00  16   embodiment.

10:06:01  17         So they're talking about figure 3, and this is

10:06:03  18   what I would call like the general setup for the patent

10:06:06  19   where they're kind of walking through:  What is a downhole

10:06:09  20   tool?  What does it look like?  It has a motor, it has

10:06:11  21   these components.  And so, they're talking about it, and

10:06:13  22   they say you have rotor stator ratios.  Here is a

10:06:17  23   six-to-seven ratio, although ratios may be employed.  And

10:06:20  24   then, the next states, it will be understood by those

10:06:23  25   skilled in the art that for a certain ratio, the motion

10:06:25 1  induced in the rotor will be eccentric, and they made a

10:06:28 2  big deal about that statement, "eccentric."

10:06:29 3      But as you can see, this is all describing the

10:06:33 4  same embodiment.  So the same embodiment where they

10:06:35 5  mentioned that in some ratios will have eccentric motion,

10:06:38 6  they talk about, well, we'll have a universal adapter 162.

10:06:42 7  And then, even further down, it says, we're going to also

10:06:44 8  have a radial bearing 174, and here's why that's

10:06:47 9  important.

10:06:48 10     The radial bearing 174 constrains the motion of

10:06:52 11 the flowhead to substantially rotational non-eccentric

10:06:56 12 motion.  So they've recognized that for some ratios, you

10:07:00 13 might end up with eccentric motion, but don't worry, we've

10:07:03 14 taken care of that and eliminated it with this radial

10:07:06 15 bearing 172.  So in the very same embodiment where the

10:07:09 16 word "eccentric" appears, they've done mechanical

10:07:13 17 adjustments to take out that eccentric motion.

10:07:14 18     So that's not something that's being taught by

10:07:16 19 this patent.  They don't teach using eccentric motion for

10:07:19 20 anything here.  I'm not sure how that plays into cyclic

10:07:23 21 because it wasn't really clear from their presentation,

10:07:25 22 but it certainly isn't a teaching of their patent.  Now,

10:07:29 23 they've got expert testimony that talks a lot about

10:07:32 24 eccentric motion.  We do, as well.  And, frankly, it's

10:07:33 25 something that I think at this time in the art, people

10:07:36  1  were trying to eliminate, your Honor.

10:07:47  2       I'm going to go back to the cyclic polyrhythmic

10:07:51  3  aspect.  I don't know if it would be helpful, your Honor.

10:07:54  4  They have talked about claim differentiation and things

10:07:56  5  being superfluous.  I didn't see that reinforced today.

10:07:59  6  I'd be happy to address why that's not at issue here.  And

10:08:02  7  I think we've already discussed the statement from the

10:08:04  8  column 3 where they said that this somehow excludes the

10:08:08  9  embodiment.

10:08:08  10      As I mentioned before, this just simply repeats

10:08:11  11  the word "cycle," once again, rather than describing the

10:08:15  12  full definition of that, which is a single revolution of

10:08:17  13  the flowhead.

10:08:18  14      THE COURT:  I think I understood Mr. Fountain to

10:08:23  15  argue, at least either here or in papers, or both, that

10:08:28  16  figure 8B would support that it could be more than one.

10:08:38  17      MR. NASH:  Polyrhythmic behavior over one cycle

10:08:40  18  -- more than one cycles?  I'm not sure that I understand

10:08:43  19  how that's possible to get that reading out of here.  So

10:08:45  20  if we take a look at what figure 8B describes and I think

10:08:48  21  slide 9 does a great job of illustrating -- it's talking

10:08:51  22  about figure 8B.  And right there at the top of this

10:08:53  23  statement here -- so this is the transition from column 8

10:08:56  24  over to column 9.  It says that figure 8B is showing the

10:09:00  25  rotational positions of the flowhead in a single cycle.

10:09:04  1          So you see the word "single cycle" there.  And

10:09:06  2     then, when we go to column 10, it talks again about that

10:09:09  3     cycle and that cycle period and reinforces, again, that

10:09:12  4     you have over one revolution of the flowhead, you're going

10:09:16  5     to have polyrhythmic behavior --

10:09:18  6          THE COURT:  You're a big fan of column 10.

10:09:21  7          MR. NASH:  I love it.  I think it's very -- it's

10:09:23  8     got all the right stuff for understanding what this term

10:09:25  9     means, your Honor.

10:09:27 10          THE COURT:  So your position would be -- and I'm

10:09:29 11     trying to help Josh Yi understand how this patent stuff

10:09:33 12     works.  Your position, your reliance for -- your primary

10:09:40 13     reliance in support of your position that it should be --

10:09:44 14     that the proposed court's construction is correct will be

10:09:48 15     found in column 10.  That would be -- and I understand

10:09:52 16     that.  And am I correct -- and they could correct me if

10:09:57 17     I'm not, but my sense is that the plaintiff would argue

10:10:02 18     that figure 8B would support their proposal.

10:10:07 19          MR. NASH:  No.  I think figure 8B supports our

10:10:10 20     proposal, your Honor.

10:10:12 21          THE COURT:  Am I incorrect that Mr. Fountain

10:10:14 22     would take a different position?

10:10:16 23          MR. NASH:  I don't know, actually.  I didn't

10:10:18 24     gather that from his discussion.  But I'd be happy to let

10:10:21 25     him respond, and then, I'd be happy to respond to that.

10:10:23  1    THE COURT:  Why don't we do that.  I may have

10:10:25  2  misunderstood.  Let me hear from Mr. Fountain real quick.

10:10:29  3  I may have misunderstood.  That was the way I took your

10:10:32  4  explanation what 8B showed with the different -- with the

10:10:35  5  way it cycled through.

10:10:38  6    MR. FOUNTAIN:  But the way I'd say it, your

10:10:41  7  Honor, is figure 8B is not inconsistent with our proposal.

10:10:43  8    THE COURT:  Okay.

10:10:44  9    MR. FOUNTAIN:  Figure 8B is repeatedly called out

10:10:48  10  as one embodiment of the patent and the cyclic

10:10:52  11  polyrhythmic pattern.  I don't believe that there's an

10:10:56  12  express discussion of 8B that talks about this eccentric

10:11:00  13  motion.

10:11:01  14    THE COURT:  Yeah.  I wasn't going with eccentric

10:11:03  15  motion.  I was going with the number of revolutions.  I

10:11:05  16  thought the way you explained 8B to me showed how this

10:11:11  17  actually operated.

10:11:13  18    MR. FOUNTAIN:  8B is -- certainly depicts one

10:11:15  19  revolution of the flowhead.  I don't take issue with Mr.

10:11:18  20  Nash's description of what's in the figure.  Of course,

10:11:21  21  that will continue to rotate as the tool is used.  And for

10:11:25  22  the reasons I've stated, if the pattern is observed across

10:11:28  23  those rotations, they're totally consistent with the

10:11:31  24  language in the patent.

10:11:32  25    THE COURT:  I've got it.  Mr. Nash, why don't you

10:11:33  1    wrap up with anything you had, then I'll hear from Mr.

10:11:36  2    Fountain again.

10:11:37  3         MR. NASH:  Yes, your Honor.  I don't have much

10:11:38  4    further to state.  It's just that you made a statement

10:11:40  5    that my strongest support is in column 10.  And I do want

10:11:44  6    to just clarify that I think there's three aspects of this

10:11:49  7    patent that reenforce, that are very -- all equally

10:11:52  8    important.  There's the definitional statement that we

10:11:55  9    have from column 8.  I've got that reflected right here on

10:11:58  10   slide 8.  That's the definitional statement i.e.  Cycle is

10:12:03  11   expressly being defined by the patentees to mean one full

10:12:06  12   rotation of the flowhead.

10:12:08  13        I think equally powerful is the description of

10:12:11  14   column -- of figure 8B in that statement from column 10.

10:12:16  15   But also, just as important and I think what kind of

10:12:19  16   compels this construction is the initial discussion by the

10:12:22  17   patentee about what is a cyclic polyrhythmic pattern.  And

10:12:25  18   you see that in column 2, lines 33 to 41, as column -- as

10:12:29  19   well as column 3, line 16 to 24, where it says, a cyclic

10:12:33  20   polyrhythmic pattern and then, immediately after that,

10:12:36  21   tells you what that means, and in that context, tells you

10:12:39  22   within a single revolution of the flowhead.

10:12:41  23        So you see that repeated in both of those

10:12:43  24   descriptions, within a single revolution of the flowhead,

10:12:46  25   because I believe that's also equally definitional.  Thank

10:12:50  1    you, your Honor.

10:12:51  2            THE COURT:  Mr. Fountain.

10:12:58  3            MR. FOUNTAIN:  So, your Honor, I would like to

10:13:30  4    start where Mr. Nash finished off, and that is with column

10:13:33  5    3, lines 51 to 55.  It's what Mr. Nash has articulated as

10:13:41  6    a definitional statement.  This was what was shown on our

10:13:44  7    slide 12 where you had two different descriptions

10:13:47  8    side-by-side.  This is the one that does not include the

10:13:49  9    language within one rotation of the flowhead.

10:13:51  10           And it's necessary for their position to say that

10:13:56  11   this is a description of a cyclic polyrhythmic pattern to

10:14:01  12   be limited to a single rotation of the flowhead to say

10:14:03  13   that the word "cycle," which is a different word than

10:14:07  14   "cyclic," limits everything that goes in the paragraph

10:14:10  15   because it's the only source of any suggestion of one

10:14:12  16   rotation of the flowhead.

10:14:14  17           If we look at a plurality of fluid pressure peaks

10:14:17  18   of varying amplitude, it says nothing about a cycle or one

10:14:22  19   rotation of the flowhead.  If we look at a plurality of

10:14:26  20   time intervals of different durations between adjacent

10:14:30  21   fluid pressure peaks, it says nothing about a cycle or one

10:14:34  22   rotation of the flowhead.  And to underscore the point

10:14:37  23   that I made at the end of my prior presentation, your

10:14:40  24   Honor, I've put this language back up on the slide and

10:14:43  25   I've scratched out the word "substantially stopped,"

10:14:46 1  right, because that's the first aspect that the patent

10:14:51 2  says is included in the cyclic polyrhythmic pattern.

10:14:54 3         To illustrate why the notion of a cycle can't

10:14:58 4  apply to what follows the first and/or, if we read this,

10:15:03 5  assuming that cycle refers to the plurality of fluid

10:15:07 6  pressure peaks of varying amplitudes, it says, the pattern

10:15:10 7  comprises at least one interval in its cycle where the

10:15:14 8  flow of the drilling fluid is a plurality of fluid

10:15:18 9  pressure peaks of varying amplitude.

10:15:21 10        I would submit that that is no longer English.

10:15:25 11 Or maybe it's English, but it's very bad English.  Right.

10:15:28 12 You cannot have a plurality of peaks at at least one

10:15:32 13 interval in a cycle.  This is consistent with what the

10:15:36 14 specification says.  The definition of cycle that we

10:15:40 15 looked at where it says, i.e., one rotation of the

10:15:45 16 flowhead is merely a description of this first aspect of

10:15:48 17 the cyclic polyrhythmic pattern.  At least one interval in

10:15:51 18 the cycle where the flow of the drilling fluid is

10:15:53 19 substantially stopped.

10:15:55 20        If you can't apply cycle to the remaining part of

10:16:01 21 that paragraph, then a construction that limits cyclic

10:16:04 22 polyrhythmic pattern to one rotation of the flowhead would

10:16:07 23 necessarily exclude two embodiments that the specification

10:16:11 24 clearly describes as being part of a cyclic polyrhythmic

10:16:16 25 pattern.

10:16:26  1    And if we could go back to slide 13.  Now, this

10:16:41  2  illustrates, your Honor, why the claims show that limiting

10:16:46  3  cyclic polyrhythmic pattern to a single rotation at the

10:16:51  4  flowhead can't be correct.  Right, what I've shown up here

10:16:55  5  is the end of claim, which recite that the fluid flow is

10:16:59  6  constrained to a cyclic polyrhythmic pattern.  Now, for

10:17:02  7  illustration, we'll just go with Rubicon's construction,

10:17:05  8  but this would apply equally to your Honor's suggested

10:17:10  9  construction that included one rotation of the flowhead.

10:17:11  10    If the cyclic polyrhythmic pattern is construed

10:17:15  11  as limited to occurring within one rotation of the

10:17:19  12  flowhead, then the underlined language of claims 2 and 3

10:17:23  13  is wholly superfluous.  Now, in its brief, Rubicon said

10:17:28  14  that we were arguing that this -- the construction of

10:17:31  15  cyclic polyrhythmic pattern would render all of claim 2

10:17:34  16  and all of claim 3 superfluous.  This is not the argument

10:17:38  17  we made.  We did make a claim differentiation.  Our

10:17:42  18  argument, we stand by that.

10:17:43  19    But, in addition, that if cyclic polyrhythmic

10:17:45  20  pattern is already construed to mean within a single

10:17:48  21  rotation of the flowhead, then the following dependent

10:17:50  22  claim that says, the pattern comprising a plurality of

10:17:54  23  fluid pressure peaks of varying amplitude in the downhole

10:17:59  24  assembly is already limited to being required to occur

10:18:03  25  within a single rotation of the flowhead.

10:18:06  1    The construction that includes within one

10:18:10  2  rotation of the flowhead clearly renders the underlying

10:18:13  3  language within a single revolution of the flowhead

10:18:16  4  superfluous; that runs counter to basic claim construction

10:18:18  5  principles; and given all the other evidence I've gone

10:18:20  6  through in the specification, this is yet another reason

10:18:23  7  why the inclusion of that phrase in the construction is

10:18:26  8  inappropriate.

10:18:26  9    Now, Mr. Nash referred to a number of statements

10:18:42  10  that he described as definitional.  And he said he really

10:18:50  11  liked claim 10.

10:18:53  12    MR. NASH:  Column 10.

10:18:54  13    MR. FOUNTAIN:  Column 10.  Thank you.  And so, I

10:18:56  14  put that up here.  And the passage, I've kind of marked

10:18:58  15  off what he was reading from, and at the bottom, it's

10:19:01  16  referring to over one revolution of the flowhead.  That's

10:19:06  17  near the bottom of this passage.  But the beginning, the

10:19:08  18  part that introduces this part says, further, referring to

10:19:12  19  figure 8B, figure 8B is only one embodiment of this

10:19:16  20  patent.  And sure, I agree that what follows in column 10

10:19:20  21  is a description of figure 8B.  I agree that it's an

10:19:23  22  accurate description of 8B, but the role in construing

10:19:27  23  claims is not to read the claims in view of specific

10:19:30  24  embodiments.

10:19:31  25    Again, it doesn't account for the fact that the

10:19:33  1   passage in claim 3 does not include the similar limitation

10:19:36  2   with reference to peak amplitude or duration.

10:19:40  3        THE COURT:  I missed you right after you said

10:19:42  4   column 3.  I couldn't understand what you said.

10:19:43  5        MR. FOUNTAIN:  Sorry.  Does not account for

10:19:46  6   column 3's disclosure or description of a cyclic

10:19:49  7   polyrhythmic pattern without any reference to one rotation

10:19:53  8   of the flowhead with respect to varying peak amplitude and

10:19:57  9   varying duration between the peaks.

10:19:59  10       THE COURT:  Okay.

10:20:00  11       MR. FOUNTAIN:  The last point I will make in this

10:20:04  12  round, your Honor, is refer the Court to figure 14.

10:20:21  13  Figure 14 is a flowhead.  It is a flowhead with a

10:20:25  14  symmetric arrangement of ports around a center flowthrough

10:20:29  15  port.  And the specification says very clearly that this

10:20:33  16  arrangement, symmetrically arranged ports, can cause a

10:20:38  17  cyclic polyrhythmic pattern.

10:20:40  18       Now, you could have varying arrangements in the

10:20:44  19  flow restrictor, but you could use this flowhead

10:20:47  20  arrangement and the eccentric motion of the rotor and part

10:20:51  21  into the flowhead as the specification discloses.  And

10:20:54  22  when this valve rotates and walks around, it will create

10:20:58  23  the cyclic polyrhythmic pattern exactly as explained by

10:21:03  24  Dr. Sharma.

10:21:04  25       Mr. Nash spent a lot of time talking about an

10:21:10  1  example embodiment that included a universal adapter, that

10:21:13  2  included a radial bearing to eliminate that walking-around

10:21:17  3  motion of the flowhead.  But, again, I'll remind the Court

10:21:20  4  that that's an example embodiment, and those features, the

10:21:23  5  radial bearing and the universal adapter, are recited in

10:21:27  6  dependent claims 10, 14 and, I believe, 35.  They do not

10:21:31  7  appear in claim 1.  And the specification's disclosure of

10:21:36  8  certain optional features that can eliminate or constrain

10:21:40  9  the eccentric motion of the rotor have no place in being

10:21:44  10  used to limit the scope of a term in claim 1 that clearly

10:21:49  11  does not require those optional features.

10:21:52  12          Unless your Honor has further questions, I

10:22:01  13  believe I've responded to Mr. Nash.

10:22:02  14          THE COURT:  I don't.

10:22:03  15          MR. FOUNTAIN:  Thank you, your Honor.

10:22:04  16          THE COURT:  Mr. Nash, if you want to at least

10:22:06  17  cover the arguments that were just made with respect to

10:22:09  18  column 3 and figure 14 and then, anything else you want.

10:22:14  19          MR. NASH:  Yes, your Honor.  Thank you very much.

10:22:16  20  I'll give brief 45 minutes to address those issues.

10:22:20  21          So I'm going to put this up there.  Hopefully

10:22:26  22  that's visible.  I'll go in the order I found.  I found

10:22:32  23  four things that I thought I could respond to, but if your

10:22:35  24  Honor would like, let's start at column 3.  So that

10:22:37  25  statement he's referring to and we could pull that back up

10:22:40  1  if we need to, but remember it's got the word "cycle" in

10:22:44  2  it and it says with -- it says cyclic polyrhythmic and

10:22:48  3  then, directly following that, it starts discussing within

10:22:52  4  an interval of a cycle, multiple amplitudes or multiple

10:22:56  5  intervals, right?  So this would be an example of that

10:22:59  6  where we see a cycle, so that's a single revolution of the

10:23:03  7  flowhead.

10:23:04  8           THE COURT:  Within 360 degrees.

10:23:06  9           MR. NASH:  That's 360 degrees.  And you see that

10:23:08  10  there are four peaks in a cycle.  An interval of that

10:23:13  11  could have two or maybe three.  Maybe there's three bumps

10:23:17  12  in a row that are all the same and then, a fourth bump

10:23:19  13  that pops up, right?  That's what that statement's

10:23:22  14  referring to, I believe, is that you can have an interval

10:23:26  15  within a cycle that might have polyrhythmic behavior, as

10:23:28  16  well.

10:23:28  17           So there's a subset of a cycle that could have

10:23:31  18  polyrhythmic behavior.  Of course, the cycle itself then

10:23:33  19  has polyrhythmic behavior.  Does that make sense?

10:23:36  20           THE COURT:  Yes, sir.

10:23:37  21           MR. NASH:  Okay.  That's how we understand that

10:23:38  22  statement in column 3.  And that's exactly why our

10:23:40  23  construction and the construction that your Honor offered

10:23:42  24  prior to this hearing.

10:23:43  25           THE COURT:  Within one revolution within -- on

10:23:45 1 your -- on the handwritten thing that you have up there is

10:23:50 2 -- would comply with your -- with the construction that

10:23:52 3 the Court proffered.

10:23:55 4          MR. NASH:  Yes.

10:23:55 5          THE COURT:  Because those would take place

10:23:57 6 within --

10:23:57 7          MR. NASH:  Entirely consistent with this type of

10:23:59 8 illustration.  Yes, your Honor.

10:24:00 9          So I'm not sure if your Honor needs to hear about

10:24:15 10 claim differentiation and -- okay.  We'll skip that.  But

10:24:19 11 claims 2 and 3, we believe, aren't superfluous.  They

10:24:22 12 certainly add additional limitations.

10:24:24 13          With respect to claim 14, I don't think I have --

10:24:29 14          THE COURT:  I think figure 14.

10:24:31 15          MR. NASH:  Figure 14.  Thank you.  I don't have a

10:24:34 16 pretty slide to that effect, your Honor, but I think

10:24:36 17 what's important about figure 14 -- and I think I do have

10:24:39 18 a little bit of the statement about 14 in the context of

10:24:41 19 one of my other claim discussions.  Here we go.  If you

10:24:44 20 look at the right-hand side of figure -- of slide 22,

10:24:48 21 there's the only description that we have of figure 14

10:24:52 22 from the patent.  This comes from column 12, lines 6 to

10:24:56 23 19.

10:24:56 24          What we see here is, it's talking about figures

10:24:59 25 13 and 14.  And this isn't something that was really

10:25:02 1 discussed much in the briefing.  Certainly that picture

10:25:04 2 that he showed is an accurate reflection of figure 14, but

10:25:08 3 what's important is that this is just the flowhead.  So

10:25:10 4 they call that flowhead 900.

10:25:12 5       And the reason why that's important, your Honor,

10:25:14 6 is because the patent is reenforced, over and over again,

10:25:19 7 when it's describing how to achieve polyrhythmic behavior.

10:25:23 8 It says that you can do it in the -- you can make changes

10:25:25 9 in the flowhead or you can make changes in the flow

10:25:28 10 restrictor, right?  Because each of them have a plurality

10:25:30 11 of ports.  And so, while you may have symmetric equally

10:25:33 12 sized and equally spaced port designs in the context of

10:25:37 13 the flowhead, you would need a flow restrictor with a

10:25:41 14 different configuration.

10:25:42 15       So if we look back at, say, here, I believe

10:25:46 16 figure 6 and 7 is reflecting a flow restrictor, okay?  And

10:25:50 17 so, on a flow restrictor like the one illustrated here in

10:25:54 18 figure 7, we have differently sized port designs.  And as

10:25:58 19 the patent teaches, it's the number, position and

10:26:02 20 dimensions of those ports, how they're arranged that

10:26:04 21 creates the polyrhythmic behavior.

10:26:05 22       So I'm not sure what else was to be taken from

10:26:10 23 figure 14.  Certainly if your Honor has more questions

10:26:12 24 about it, I'd be happy to address them.  But I think

10:26:15 25 figure 14 is entirely consistent with our construction,

10:26:17  1  and it's consistent with our understanding of what the

10:26:19  2  patent is teaching.

10:26:20  3          The only other thing that I noted that I thought

10:26:23  4  I might respond to is counsel's statement that we are

10:26:27  5  relying on only one embodiment, and that's the figure 8

10:26:31  6  embodiment.  And I know I've mentioned this, your Honor.

10:26:33  7  I won't belabor it again, but it's not that we're relying

10:26:36  8  on one embodiment.  We're relying on the patentee's own

10:26:39  9  definition of what constitutes a cycle.  And the patentee

10:26:42  10 defined it in columns 2 and 3, and then, it reinforced

10:26:45  11 that definition again in column 8, when it used the Latin

10:26:48  12 i.e. to mean that is one revolution of the flowhead.  And

10:26:53  13 so, you see that definition being consistently applied in

10:26:56  14 the beginning, middle and end of this patent.

10:26:59  15         Unless your Honor has further questions, I'm

10:27:01  16 happy to sit down.

10:27:02  17         THE COURT:  Mr. Fountain, anything additional?

10:27:09  18         MR. FOUNTAIN:  No, your Honor.

10:27:10  19         THE COURT:  Okay.  We're going to take a

10:27:11  20 five-minute -- a very brief recess and I'll come back out

10:27:17  21 probably -- most likely be able to give you a construction

10:27:20  22 today, and then, we will take up the next claim term.  So

10:27:26  23 if you need to powder your nose or do anything else,

10:27:30  24 that's fine, as well.  But we'll be gone for just a couple

10:27:33  25 of minutes.

10:32:40  1          (Recess.)

10:38:49  2          THE COURT:  Let me just make this statement on

10:38:52  3  the record.  That was absolutely one of the best arguments

10:38:59  4  from both sides that I've had.  I regret that I'm going to

10:39:03  5  have to pick one only.  And that if there was a way that

10:39:09  6  you both would win, it would be arguments as good as

10:39:13  7  those.  Very compelling.  But I get paid to make the

10:39:20  8  decision.

10:39:21  9          What I'm going to do is, I'm going to mostly

10:39:26  10  stick with the construction I told you I was going to use.

10:39:33  11  The only difference is, which is not much of a difference,

10:39:36  12  but I'm going to add the words "a pattern of," colon, to

10:39:43  13  begin the construction that I gave you.  So the entire

10:39:47  14  court construction for a cyclic polyrhythmic pattern will

10:39:52  15  be a pattern of, colon, two or more different rhythms

10:39:56  16  within one revolution of the flowhead wherein a rhythm

10:40:02  17  refers to either varying amplitude or duration between

10:40:07  18  pressure peaks.

10:40:08  19          The next claim term we have to take up is the

10:40:12  20  claim term "such that fluid pressure resulting from fluid

10:40:18  21  flow through the ports of the flowhead and the flow

10:40:22  22  restrictor is constrained to a cyclic polyrhythmic

10:40:26  23  pattern."  The plaintiff has proposed no construction

10:40:30  24  necessary.  The Court has indicated that that is going to

10:40:36  25  -- we are going to go with the plain and ordinary meaning.

10:40:41  1  Therefore, I'll ask Mr. Nash to go.

10:40:45  2          MR. NASH:  Thank you, your Honor.

10:40:47  3          And I did confer with opposing counsel right

10:40:49  4  before this about this term.  We don't have agreement

10:40:53  5  certainly, but where we wanted to make sure we had

10:40:57  6  clarification, I think your Honor just provided it, was

10:40:59  7  that Rubicon's position from the beginning has also been

10:41:01  8  that the plain and ordinary meaning would govern.  In

10:41:04  9  fact, we're totally fine with the claim language as it is.

10:41:06  10          But it was only through the parties' discussions

10:41:09  11  that we came to understand that the parties are kind of in

10:41:12  12  dispute over what plain and ordinary meaning is in this

10:41:15  13  context.  And so, we have kind of an 02 Micro problem, if

10:41:19  14  you will, that we would like your Honor's guidance on.

10:41:22  15          So with the assumption that your Honor is sort of

10:41:26  16  embracing their side, I thought I would go first, and it

10:41:29  17  sounds like your Honor would appreciate that.

10:41:31  18          THE COURT:  And at least now, as of now, we don't

10:41:39  19  believe that the proper understanding of plain and

10:41:51  20  ordinary meaning would require an arrangement of the ports

10:41:54  21  limitation that you're advocating.

10:41:56  22          MR. NASH:  Yes.  Understood, your Honor.

10:41:57  23          THE COURT:  So that's the up -- that's the road

10:42:00  24  up which you are going uphill.

10:42:03  25          MR. NASH:  Understood.  Well --

10:42:04   1           THE COURT: And is that the fight that you all

10:42:06   2   think you have, as well, in terms of the 02 Micro? Or is

10:42:09   3   there something more than that?

10:42:11   4           MR. NASH: I think that's fair, your Honor. I

10:42:14   5   think that if I was to articulate where I think the

10:42:16   6   dispute lies is that we believe that it's the ports that

10:42:21   7   create the polyrhythmic pattern. And specifically, how

10:42:23   8   the ports come into and out of alignment is based

10:42:27   9   certainly on the port design, and that's what creates

10:42:30   10   polyrhythmic behavior. And that's the only thing that the

10:42:32   11   patent teaches.

10:42:33   12           I believe that they have conceded that the ports

10:42:37   13   going into and out of alignment creates the polyrhythmic

10:42:39   14   pattern, as opposed the something else, I suppose. But I

10:42:42   15   believe that they would like that to be broader in the

10:42:45   16   sense that -- actually, we'll have to see what they have

10:42:48   17   to say about it.

10:42:50   18           But it seemed at some point, that maybe we don't

10:42:53   19   have that much of a dispute. So perhaps we could get to

10:42:56   20   some resolution here today on that.

10:42:58   21           THE COURT: Yeah, we are -- it is unlikely we

10:43:02   22   will find -- we will take the position that you are

10:43:05   23   advocating with regard to the arrangements of the ports.

10:43:10   24           MR. NASH: Sure. And to be clear, your Honor,

10:43:11   25   we're not beholden to the word "arrangement." We do

10:43:17 1  think, though, that it's the ports that cause this

10:43:20 2  polyrhythmic behavior.  I'd be happy to walk briefly

10:43:22 3  through that.

10:43:23 4          THE COURT:  Sure.

10:43:24 5          MR. NASH:  I think if your Honor will join me, we

10:43:28 6  believe that the structure and plain language of the

10:43:31 7  meaning -- sorry, plain meaning of the claim language

10:43:34 8  dictates this requirement.  We also believe that it's a

10:43:36 9  consistent message that's being told throughout this

10:43:40 10 patent.  And importantly, there is no other teaching in

10:43:44 11 this patent on how to achieve polyrhythmic behavior.  And,

10:43:47 12 so, with those three things all coupled together, we do

10:43:49 13 think that there is an indication in the claim language

10:43:53 14 itself, as well as throughout the teaching of this patent,

10:43:55 15 that there's a requirement that the port design be what

10:43:58 16 creates the polyrhythmic behavior.

10:43:59 17         So I'll start just a brief look at the claim

10:44:03 18 language.  I know your Honor's studied this extensively,

10:44:05 19 and we've already talked about cyclic and polyrhythmic

10:44:09 20 patterns.  But as we see from this aspect of the claim

10:44:11 21 language, that whole wherein clause has a lot of causation

10:44:14 22 aspects to it.  It talks about the motor causing the ports

10:44:17 23 to enter into and out of alignment.  It's not just going

10:44:22 24 into and out of alignment, but the ports go into and out

10:44:25 25 of alignment in such a way such that the fluid pressure

10:44:29  1  resulting from that is constrained to a polyrhythmic

10:44:33  2  behavior.

10:44:33  3      So what I think's important and the reason why we

10:44:36  4  had to highlight this issue is, in our initial discussions

10:44:39  5  and what I saw in the original brief from Impulse was that

10:44:45  6  anything could be creating the polyrhythmic pattern.  You

10:44:47  7  simply had to show that there's a polyrhythmic pattern and

10:44:50  8  you've met the limitation.  I think they've changed their

10:44:52  9  position a little bit, your Honor, and we may be getting

10:44:54  10  closer to joining the issues on this.

10:44:56  11      THE COURT:  Well, here is what I think, at least

10:45:00  12  at the moment, is -- and I face this a lot.  You know,

10:45:05  13  when I was on y'all's side and people did plain and

10:45:10  14  ordinary meaning, I always thought that was kind of a --

10:45:14  15  judges were, in a lot of ways, dodging having to make a

10:45:17  16  harder decision.  What I'm learning from being on this

10:45:21  17  side of the bench is, oftentimes, what usually defense

10:45:28  18  counsel is arguing is, they want -- they don't want the

10:45:33  19  plaintiff to have more field than what the plain and

10:45:39  20  ordinary meaning ought to be, and they want me to put that

10:45:42  21  in the claim construction.

10:45:49  22      What I have found, I think, is the more likely --

10:45:52  23  is the better way of dealing with this, rather than the

10:45:58  24  way you're suggesting right now is, I don't think

10:46:03  25  construction's necessary.  And I think were the plaintiff

| | |
|---|---|
| 10:46:08 | 1 | to take and their expert to take a position that you |
| 10:46:12 | 2 | thought was in -- I think this language is pretty clear |
| 10:46:16 | 3 | for example. |
| 10:46:17 | 4 |     MR. NASH:  We do, too, your Honor. |
| 10:46:18 | 5 |     THE COURT:  I think if you -- if their expert |
| 10:46:22 | 6 | were to take a position that your company infringed that |
| 10:46:26 | 7 | was outside of what these words say, the proper way for me |
| 10:46:31 | 8 | to deal with this is not at the claim construction phase |
| 10:46:36 | 9 | because we're not really helping the jury here, either, to |
| 10:46:38 | 10 | tell the truth.  It would be a summary judgment saying |
| 10:46:41 | 11 | they're wrong, or Daubert, but whatever it is.  And so, to |
| 10:46:46 | 12 | me, on this -- for example, on this specific claim term, |
| 10:46:50 | 13 | that's the way I think it ought to be dealt with. |
| 10:46:53 | 14 |     I mean, I have as high respect for plaintiff's |
| 10:46:58 | 15 | counsel as I could possibly have, and so, I'm certain that |
| 10:47:03 | 16 | they are going to not give you the opportunity to file a |
| 10:47:08 | 17 | motion for summary judgment by claiming infringement that |
| 10:47:11 | 18 | exceeds what that language says; but in the event that you |
| 10:47:13 | 19 | think that they do, I think that would be the better time |
| 10:47:17 | 20 | to take this up.  Because I don't think, in some ways, the |
| 10:47:23 | 21 | juice is worth the squeeze here in terms of coming up with |
| 10:47:28 | 22 | a claim construction.  It's just trying to put into words |
| 10:47:32 | 23 | what you think they have to prove. |
| 10:47:35 | 24 |     Does that make sense? |
| 10:47:36 | 25 |     MR. NASH:  Yeah.  It does your Honor.  And I |

10:47:38  1  understand what you're describing, which is that, really,

10:47:40  2  there's a better stage to take the stand on this.

10:47:43  3      THE COURT:  That's right.  I don't see this

10:47:46  4  helping the jury by taking one sentence that's 30 words

10:47:53  5  long and replacing it with another sentence that's 30

10:47:56  6  words long.

10:47:57  7      I understand what you are -- the position you're

10:48:02  8  taking with what has to happen.  And if their expert takes

10:48:06  9  the position that's inconsistent with the language that's

10:48:09  10  here, I would think you would be able to let me know, and

10:48:12  11  we could take it up at later time.

10:48:14  12      MR. NASH:  Understood, your Honor.

10:48:16  13      If I may just for a few moments.

10:48:19  14      THE COURT:  Sure.

10:48:19  15      MR. NASH:  If the Court would indulge me, I would

10:48:22  16  like to kind of explain why I think there is an importance

10:48:25  17  to this aspect.

10:48:26  18      You may be right that perhaps the construction

10:48:28  19  aspect isn't really the appropriate venue, although I do

10:48:32  20  think that there is the ability to clarify what a plain

10:48:35  21  and ordinary meaning would be with an instruction to the

10:48:37  22  jury that could be helpful here.  So not necessarily

10:48:39  23  construing the claim but, rather, saying the words mean

10:48:42  24  what say, and that means that you would look to the port

10:48:46  25  design to determine if it creates a polyrhythmic behavior.

10:48:49   1          So I think why this might be important to do at

10:48:53   2   this stage is that it could dictate the scope of discovery

10:48:56   3   and the disputes.  It could resolve some disputes before

10:49:00   4   they even start in terms of what we're looking for to

10:49:02   5   determine whether or not there is infringement.  Because

10:49:05   6   as this patent teaches and as the patentees tried to

10:49:08   7   explain with all these figures and extensive discussion is

10:49:13   8   its port design that their -- their intended method of

10:49:17   9   creating polyrhythmic behavior was the port design.  And

10:49:19  10   that's evident by virtue of the fact that you just flip

10:49:22  11   through these figures, your Honor, and all the figures

10:49:24  12   show is various port configurations.

10:49:26  13          There's multiple different port configurations.

10:49:29  14   And so, when you look to do I infringe or not, or is this

10:49:34  15   invalid or not, that's what you should be able to look to,

10:49:36  16   as well.  We'll look at the port designs, we'll see how

10:49:39  17   the ports are designed to operate, right?  And why that's

10:49:42  18   important, your Honor, is because if we aren't being clear

10:49:46  19   about that, that you can look just to the port design to

10:49:49  20   determine the polyrhythmic behavior, we may get into a

10:49:51  21   situation where there's all this additional complication:

10:49:54  22   Oh, well, what's this about the motor?  And what's this

10:49:56  23   doing and what's that doing?  But, really, all this patent

10:49:59  24   is about is port design.

10:50:01  25          I don't know if it would be helpful, your Honor,

10:50:04  1  but if it's okay, I would like to kind of briefly touch on

10:50:07  2  the aspects of the specification that reflect that.

10:50:08  3  THE COURT:  I think my clerks and I have been

10:50:10  4  through that pretty carefully.  I think unless plaintiff's

10:50:17  5  counsel just has a burning desire to stand up and speak,

10:50:20  6  even though I'm going to rule in their favor, here's the

10:50:26  7  way I see it.

10:50:28  8  I'm going to go with no construction necessary.

10:50:32  9  And the order that we write will probably make it clear

10:50:38  10  that there is no reading of requiring arrangement of the

10:50:42  11  ports limitation into the claim.  But I will let the

10:50:48  12  plaintiff know that from our reading of the patent, it

10:50:55  13  would be -- we didn't see anything other than the

10:50:58  14  arrangement that affects the alignment, which is, I think,

10:51:01  15  what you were saying, Mr. Nash.

10:51:03  16  MR. NASH:  Yes, your Honor.

10:51:04  17  THE COURT:  And so, again, I think the better

10:51:09  18  time to take this up -- that's my claim construction.  But

10:51:13  19  the Court will certainly -- once you have their

10:51:17  20  infringement contentions, if you think it falls outside

10:51:20  21  the ambit of what is required in the patent, we'll take it

10:51:24  22  up at summary judgment and at a hearing.

10:51:27  23  MR. NASH:  Great.  Thank you very much, your

10:51:29  24  Honor.

10:51:29  25  THE COURT:  I didn't -- I actually asked if the

10:51:31  1  plaintiff wanted to say anything.

10:51:33  2          MR. FOUNTAIN:  I think we made our position clear

10:51:35  3  in the brief, and we're fine with your Honor's articulated

10:51:38  4  one.

10:51:39  5          THE COURT:  Next up is "arranged around a central

10:51:46  6  axis."  The defendant has argued that it's indefinite.  I

10:51:51  7  understand why he has.  I'll hear from the plaintiff as to

10:51:56  8  why it's not first.  I'm sorry.  I got it backwards.  I'm

10:52:03  9  going to hear from -- I didn't get home till late last

10:52:07  10  night.  I'll hear from the defendant as to why you believe

10:52:09  11  it's indefinite.  I know that the -- I know the plaintiff

10:52:13  12  does not think it's indefinite.

10:52:14  13          MR. TEPERA:  Your Honor, may it please the Court.

10:52:33  14  I'm Steven Tepera on behalf of Defendant Rubicon.  And I'm

10:52:38  15  handling each of the indefiniteness claims that we're

10:52:41  16  going to be doing today.

10:52:41  17          THE COURT:  Well, then, why don't we, unless the

10:52:43  18  plaintiff doesn't want to, can we take those up together

10:52:47  19  and you go and then, y'all will go?  Do you care?  Or do

10:52:50  20  you think they should be done independently?

10:52:54  21          MR. GUARAGNA:  I think we can go in series, your

10:52:56  22  Honor.  That's fine with me.

10:52:56  23          THE COURT:  Okay.

10:52:57  24          MR. TEPERA:  Thank you.

10:52:59  25          The first indefiniteness claim, your Honor, is

10:53:02 1 arranged around a central axis. We claim that it's

10:53:05 2 indefinite. The plaintiff has claimed alternate positions

10:53:08 3 in its initial brief. No construction necessary. Or

10:53:12 4 distributed between the center and the periphery of the

10:53:15 5 flowhead. I know your Honor's looked at this quite a bit,

10:53:18 6 but it appears in the second limitation of the independent

10:53:22 7 claims.

10:53:23 8 And what is it that's arranged around the central

10:53:26 9 axis, it says, the flowhead comprises a plurality of

10:53:29 10 ports, and they are arranged around the central axis of

10:53:32 11 the flowhead. To understand, I think, our position here,

10:53:37 12 it's useful to back up and understand how this patent was

10:53:40 13 put together. Seems very clear to us that the inventors,

10:53:43 14 when they were writing this patent, put together an

10:53:46 15 invention where they had conceived a three-port scenario,

10:53:51 16 a four-port scenario, a five-port scenario, and that's

10:53:54 17 reflected throughout the specification.

10:53:55 18 Each of the figures as Mr. Nash just discussed,

10:53:59 19 you flip through all figures, they all look like various

10:54:02 20 port configurations. And, of course, the descriptions

10:54:05 21 that go along with that have similar descriptions of three

10:54:09 22 ports, four ports, five ports scenario, and there's text

10:54:12 23 hence throughout, but that's the case, as well, different

10:54:14 24 things sort of imply at least three ports, four ports,

10:54:17 25 five ports and up.

10:54:19 1    But in the course of writing the claims, as

10:54:23 2 patent prosecutors tend to do, they like to use the word

10:54:26 3 "plurality," and that's what snuck into the claim to start

10:54:29 4 with, a plurality of ports that are arranged around the

10:54:32 5 central axis.  And we acknowledge that plurality means two

10:54:35 6 or more.  Where the indefiniteness comes in, your Honor,

10:54:39 7 is the tension that arises with the positional statements

10:54:43 8 of where those ports are arranged because we think that

10:54:47 9 the positional statements require that it be three or more

10:54:51 10 whereas the word "plurality" is two or more, and that

10:54:54 11 irreconcilable conflict leads to an indefiniteness

10:54:57 12 conclusion.

10:54:57 13    We think on our side, we have kind of the plain

10:55:01 14 and ordinary meaning of arranged around as this encircling

10:55:04 15 on all sides in every direction.  Or the figures all are

10:55:09 16 consistently shown an arrangement around.  In fact,

10:55:10 17 there's little circles that are drawn in several figures

10:55:14 18 around the central axis.  The Federal Circuit has

10:55:17 19 conveniently construed "around" before to mean on all

10:55:21 20 sides on this Pods case.  And, in fact, we think the

10:55:23 21 litigants here today both sort of embraced the same

10:55:27 22 meaning of "arranged around" in their opening brief.  We

10:55:29 23 both latched onto the same example of it's like arranging

10:55:33 24 chairs around a table.

10:55:34 25    Dr. Noynaert, in his declaration, gives a good

10:55:42  1  explanation of what it means to be arranged around and why

10:55:44  2  it implies three or more.  He synthesizes the figures, the

10:55:48  3  specification, basic geometry, and his knowledge as a

10:55:52  4  skilled artisan of what it would mean, and he provides

10:55:55  5  these examples that I've included here.

10:56:00  6          For instance, the top left in a four-port

10:56:03  7  scenario, the four ports suggest an area between them that

10:56:06  8  captures the central axis, right?  Those are arranged

10:56:09  9  around the green central axis there, and he contrasts that

10:56:14 10  with one where a skilled artisan would look at this patent

10:56:16 11  and understand that they are not arranged around a central

10:56:19 12  axis.  We have the four-port scenario on the second image.

10:56:21 13  Those are arranged around something other than the central

10:56:23 14  axis.

10:56:24 15          And it happens to conveniently also have figure 7

10:56:28 16  in the patent, have a similar sort of description to it.

10:56:30 17  It has that circle drawn in phantom to show and, sure

10:56:33 18  enough, they capture the central axis there.  He contrasts

10:56:37 19  it with the two-port scenario, and that's an important

10:56:40 20  embodiment that we're going to be looking at in this case

10:56:42 21  in general, and says you can't arrange two ports around

10:56:45 22  something.  It doesn't suggest a captured area, right?

10:56:49 23  Two ports suggest a line.  A line segment, there is no

10:56:52 24  area there.  And so, he provides these twelve examples.

10:56:56 25          How would a skilled artisan understand whether or

10:56:59   1   not in these two example -- in these 12 examples, whether

10:57:03   2   or not they were arranged around a central axis? He says

10:57:05   3   they don't suggest any sort of captured area. His example

10:57:09   4   -- his geometric kind of explanation of that is, well,

10:57:13   5   because two ports, you could draw an infinite number of

10:57:16   6   circles that capture areas outside, it captures inside,

10:57:20   7   contrast that with three ports or more scenario, which

10:57:23   8   would suggest a unique circle, as you see in the red

10:57:26   9   dotted lines in phantom in the above. So that's the

10:57:29  10   general idea.

10:57:30  11       You need to have a sufficient number of ports to

10:57:32  12   suggest this captured area, and it requires at least three

10:57:37  13   ports to do that. By analogy, if we had a plurality --

10:57:43  14   we're claiming a barstool and there is a plurality of legs

10:57:46  15   arranged to support the seat, and you think, okay, that's

10:57:49  16   three legs, four legs, five legs, it should raise a red

10:57:53  17   flag in your head when you think that actually includes

10:57:56  18   two legs and that doesn't really accomplish -- you can't

10:57:58  19   arrange them to accomplish what you said there or arrange

10:58:01  20   a plurality of points on vertices of a triangle, okay?

10:58:06  21   You can do three, you can do four, you can do 20 and dot

10:58:09  22   around a triangle. But you can't really do two and have

10:58:11  23   that arrangement that is required there, and that's our

10:58:13  24   general argument.

10:58:14  25       THE COURT: Is there anywhere in the patent they

10:58:16  1  disclaim having only two ports?

10:58:20  2          MR. TEPERA:  We think it's implicit in this

10:58:22  3  arrangement language if you really go Phillips.  Let's

10:58:25  4  stick with the arrangement language, with the claim

10:58:28  5  language, rather, we think it's implicit in there.  But

10:58:31  6  there is not -- I'll concede there's not express statement

10:58:32  7  that two is not included, and, indeed, plurality includes

10:58:37  8  two more.

10:58:37  9          THE COURT:  Or that it has to be three or more?

10:58:40  10  Is there anywhere in the patent that indicates it has to

10:58:42  11  be three or more?  I get the implicit.  I don't need to

10:58:44  12  hear the implicit again.  Is there anywhere in the patent

10:58:47  13  where it explicitly indicates that there need to be three

10:58:52  14  or more?

10:58:53  15          MR. TEPERA:  There are different examples of

10:58:55  16  three or more certainly.  There is argument that we've

10:58:58  17  presented in the brief that says some pulses can be the

10:59:00  18  same and some pulses can be different.  That implies three

10:59:03  19  or more in order to get polyrhythmic, which I think is

10:59:07  20  consistent with the construction that we're getting today

10:59:08  21  on polyrhythmic behavior.  I agree that there's nothing

10:59:11  22  that says it has to be three.  But that is not explicit.

10:59:15  23          THE COURT:  Polyrhythmic is just one or more.

10:59:18  24          MR. TEPERA:  I think that's true with varying

10:59:21  25  amplitudes or varying time intervals between them, which

10:59:24  1  seems to be what the Court is construing today, and that

10:59:27  2  would, at least in our understanding of how the ports

10:59:31  3  work, require at least three ports to have different

10:59:33  4  spacing between them.  Between the peaks.

10:59:37  5        Impulse -- at least the lack of clarity of the

10:59:43  6  term, I think, is sort of made by Impulse's varying

10:59:46  7  positions throughout the briefing where they latch onto

10:59:49  8  one definition or another through the various briefs.  In

10:59:52  9  the first brief, they have two very different

10:59:54  10 constructions of it's sort of like chairs around a table.

10:59:57  11 We don't really take issue with that.  We sort of agree

10:59:59  12 that that's what it is.  But, also, very differently is

11:00:01  13 distributed between the center and the periphery of the

11:00:03  14 flowhead, very unlike arranged around a table.

11:00:06  15        In the next brief, they say, well, any port is

11:00:08  16 arranged around the central axis because it's going to

11:00:12  17 spin around the central axis when you rotate this.  And

11:00:15  18 then, they latch onto a dictionary definition of to go

11:00:19  19 around or to avoid like a car driving around the lake, the

11:00:22  20 road goes around the lake.  And I think the very fact that

11:00:24  21 we have these four very different definitions they latched

11:00:27  22 onto indicate that there's some lack of precision that

11:00:31  23 probably doesn't meet the Nautilus standard of reasonable

11:00:36  24 certainty that needs to be provided on the scope of these

11:00:38  25 claims.

11:00:38  1      And so, we have the stationary definition, the

11:00:40  2  rotating definition, the distributed definition, the

11:00:43  3  avoiding definition, all of which plaintiffs have

11:00:45  4  provided.  And we can go through and attack those sort of

11:00:49  5  one at a time and show why individually they're not good.

11:00:52  6  I'll just really quickly go through these because I don't

11:00:54  7  think the Court's actually going to be construing this

11:00:56  8  term to mean any one of those but -- based on its

11:00:59  9  preliminary constructions.

11:01:00  10      But distributed between the center and the

11:01:03  11  periphery of the flowhead, first obviously it's nothing

11:01:07  12  like their other construction that they give in the same

11:01:09  13  brief, and that tension, I think, is apparent with the

11:01:13  14  chairs around the table.  It's basically meaningless.  It

11:01:16  15  doesn't have any sort of restriction on where you put the

11:01:19  16  ports.  And the word "between" really jumps out at me.

11:01:22  17  When I'm seeing that, it seems almost the opposite of

11:01:25  18  around.  To arrange something between two points, it seems

11:01:28  19  very dissimilar to arranged around something.

11:01:31  20      And I think it's important, also, to point out

11:01:34  21  where they get this from.  In column 12, a description of

11:01:37  22  figure 14, there is a description head ports on this

11:01:41  23  particular valve are distributed between the central axis

11:01:47  24  and the periphery of the flowhead, just like they are in

11:01:49  25  the other ports.

11:01:51 1    And it's true that it's described in there, but

11:01:53 2  there's nothing in there that indicates this means the

11:01:55 3  same thing as arranged around.  It's not a substitution of

11:01:58 4  one for the other.  And importantly, I think the

11:02:03 5  consequence of that, of grabbing onto that language in the

11:02:06 6  specification and claiming that this claim language means

11:02:08 7  this, ends up doing what defendants are often accused of

11:02:15 8  doing, which is importing limitations from the

11:02:17 9  specification into the claim.

11:02:19 10    Now they have this distribution limitation and

11:02:24 11  they have imported that in the claim; but in addition to

11:02:26 12  doing that, they've been able to delete the actual claim

11:02:30 13  language that's in there.  So no longer do they have to

11:02:32 14  actually show it's arranged around.  They just need to

11:02:34 15  show that it's distributed.  So it's the substitution of

11:02:37 16  the actual claim language for what they wish was the claim

11:02:40 17  language.

11:02:40 18    The next in the responsive brief, they have the

11:02:45 19  rotating around the flowhead.  A few major red flags with

11:02:49 20  respect to that is, note that that doesn't even require a

11:02:52 21  plurality of ports for one.  If anything spins around, the

11:02:56 22  central axis is arranged around it, then a single port

11:02:59 23  could be arranged around it because it would rotate around

11:03:02 24  the flowhead.

11:03:03 25    But, more importantly, I think from a claim

11:03:06  1  language perspective is, that movement is already built

11:03:09  2  into that very limitation in the claim.  We have a

11:03:14  3  plurality of ports arranged around the central axis, which

11:03:17  4  is this placement sort of implication, but it's placed on

11:03:23  5  a flowhead, which is driven by the motor around the

11:03:25  6  central axis.

11:03:26  7         So we already have this requirement in the patent

11:03:29  8  that these ports move around the central axis.  And so,

11:03:33  9  what they've done is, they have duplicated that limitation

11:03:37  10 with the effect of eliminating the actual arrangement of

11:03:40  11 ports there.

11:03:42  12        And the final definition that they grabbed onto

11:03:45  13 is, it's like a road going around a lake or a car driving

11:03:48  14 around a lake.  There's no explanation of how you would

11:03:53  15 apply that to ports that aren't moving.  There's no

11:03:57  16 declaration that's associated with that.  It's just very

11:03:59  17 dissimilar to everything else that is in the pleadings

11:04:02  18 until now.

11:04:03  19        One thing that's also worth pointing out in this

11:04:09  20 is, amongst the various definitions, you have distributed,

11:04:12  21 you have this moving around.  Think about what sort of

11:04:15  22 arrangements would fall within the scope of that.  It

11:04:18  23 seems to me that even the second figure, the four ports

11:04:22  24 that are off center would be distributed between the

11:04:24  25 central axis and the flowhead.  They would also be

11:04:27  1  rotating around the central axis.

11:04:29  2          And the only record evidence, and it seems

11:04:32  3  intuitively correct, is Dr. Noynaert saying a skilled

11:04:35  4  artisan would never understood that second figure to be --

11:04:37  5  have ports distributed around the central axis.  The

11:04:40  6  constructions are very nonintuitive, and there's no expert

11:04:43  7  testimony or no indication that a skilled artisan would

11:04:46  8  understand it to mean what it is that they explain.

11:04:49  9          THE COURT:  Is there any argument that one

11:04:56  10  skilled in the art would not be able to determine what --

11:04:59  11  based on what the patent is talking about with regard to

11:05:00  12  what the central axis is?

11:05:04  13          MR. TEPERA:  There's no dispute of that.  We

11:05:05  14  concede it as the center point of the -- there's Dr.

11:05:10  15  Noynaert has this nice figure, shows cross hairs and the

11:05:13  16  red dot being the center point that's consistent with

11:05:16  17  these constrained valves rotating within the bearing like

11:05:20  18  Mr. Nash has indicated.  And so, it's the very center

11:05:23  19  point of what it is, and I don't think that Impulse has

11:05:24  20  argued otherwise.

11:05:25  21          THE COURT:  And so, your argument is only that

11:05:29  22  whether or not the ports are arranged around a central

11:05:32  23  axis could be understood by one skilled in the art.

11:05:35  24          MR. TEPERA:  When applied to as few ports as

11:05:38  25  Impulse is trying to apply it to, which is two-port

11:05:41  1    scenario.

11:05:41  2         THE COURT:  Okay.

11:05:42  3         MR. TEPERA:  There are a few arguments that are

11:05:44  4    in the briefs that I think are worth addressing where they

11:05:47  5    attack our position.  They attack our fundamental position

11:05:51  6    that the patent doesn't have an explicit disclosure of two

11:05:56  7    ports.  And they have this excerpt that says the

11:05:59  8    specification provides specific examples of flowheads with

11:06:02  9    four ports and three ports.  I have a red highlight, it's

11:06:05  10   hard to see but explains that fewer ports may be provided.

11:06:09  11        Well, the specification doesn't say that.  The

11:06:10  12   specification is talking about figures 4 and 5 of that

11:06:14  13   portion of the patent that says in figures 4 and 5, the

11:06:19  14   body is provided with four ports, although more or fewer

11:06:22  15   are -- may be provided.  And you can contrast that with

11:06:26  16   and we have 16 different examples that we referenced in

11:06:29  17   our brief of when they're discussing three ports, and

11:06:31  18   never in those 16 different examples do they say fewer

11:06:34  19   than three is possible.

11:06:35  20        THE COURT:  Here's my problem with your -- your

11:06:40  21   all's argument is, you're sort of taking out of this that

11:06:46  22   the folks who are doing this would know where things go.

11:06:50  23   And what I mean by that is, you know, if friends gathered

11:06:58  24   to watch the Superbowl, two friends gathered to watch the

11:07:03  25   Superbowl on a big screen TV, which was in the middle of

11:07:07  1   the room, and they gathered around the TV.  My guess is

11:07:12  2   they would both be sitting in front of the TV, next to

11:07:15  3   each other.  You wouldn't say they weren't gathered around

11:07:17  4   the TV, which is the center point.  And in the context of

11:07:24  5   what they're doing, which is what you have to -- one

11:07:28  6   skilled in the art would have to hear is taking the

11:07:30  7   context of what you're doing by using this patent.

11:07:36  8        So I'm having a hard time -- it seems to me that

11:07:39  9   you all are making more out of this than is there that

11:07:48  10  this is indefinite, given the technology that's involved

11:07:53  11  here.  I'm not really following you guys on this point.

11:07:57  12       MR. TEPERA:  I think what's important to -- with

11:07:59  13  that, your Honor, is gather around the TV, these are very

11:08:03  14  familiar things.  This is the very point of novelty of

11:08:06  15  this invention.  They're inventing based on the fact that

11:08:08  16  nobody has ever done this before, and that's why the

11:08:11  17  description has to be more explicit because we're not

11:08:13  18  bringing in the sort of inherent knowledge that one has

11:08:16  19  when you're putting chairs around the table.  That analogy

11:08:19  20  sort of failed for that reason, bringing people before a

11:08:21  21  TV.

11:08:21  22       THE COURT:  One skilled in the art wouldn't know

11:08:24  23  what arranged around a central axis is?  I have to -- I

11:08:27  24  mean, when I read it, I had a pretty good idea of what it

11:08:31  25  meant.  And I'm, as Brian Nash will assure you and

11:08:36  1    everyone at John Guaragna's table will assure you, I am

11:08:39  2    not one skilled in the art.  And so, it's -- if I feel

11:08:45  3    like I could understand it, given the context of the

11:08:49  4    technology, I have a hard time finding that something's

11:08:52  5    indefinite.

11:08:55  6                MR. TEPERA:  I think my response to that would be

11:08:57  7    at least there are other people of significant skills --

11:09:03  8                THE COURT:  That not everyone's as dumb as I am?

11:09:05  9                MR. TEPERA:  Pardon me?

11:09:06  10               THE COURT:  Not everyone's as dumb as I am?  No.

11:09:08  11   I just --

11:09:09  12               MR. TEPERA:  I don't want the Court to think that

11:09:11  13   I was saying that.

11:09:13  14               THE COURT:  I mean, Mr. Guaragna might have said

11:09:16  15   that, but not probably here.  I think I've got your

11:09:23  16   argument.

11:09:23  17               MR. TEPERA:  Just my final response to that, if I

11:09:26  18   can have one more minute of your time on this is, I think

11:09:30  19   at least within this courtroom, there would be

11:09:32  20   disagreement whether or not there is -- the second picture

11:09:35  21   shows ports arranged around, because it falls within

11:09:37  22   pretty clearly two of the constructions that the

11:09:39  23   plaintiffs have proposed today.

11:09:42  24               THE COURT:  I understand your argument.

11:09:47  25               MR. TEPERA:  The final explanation I have, before

11:09:51  1  I sit down on this topic, unless we're going to go through

11:09:55  2  all of them at once, is the -- in addition to trying to

11:09:59  3  point out that there -- it's possible that it's been

11:10:01  4  disclosed that there's two ports, plaintiffs also say, but

11:10:04  5  regardless, you can arrange two ports around a central

11:10:08  6  axis.

11:10:08  7          And what they've done is, they've drawn a figure

11:10:11  8  where they say if the port is sufficiently deformed, if

11:10:16  9  it's elongated into this horseshoe sort of shape, then I

11:10:21  10  could say that that is arranged around a central axis.

11:10:23  11  And I think that at some level, that's a concession that

11:10:25  12  regular circular ports can be arranged around a central

11:10:29  13  axis when they have to deform so much.  But I think the

11:10:31  14  important part of this is, it's contrary to the

11:10:36  15  specification's teachings in all through column 7 and

11:10:39  16  column 8, where are these things arranged around?  What

11:10:42  17  does it mean to be arranged?  And throughout the

11:10:44  18  specification says, the center point is arranged here this

11:10:47  19  is arranged at this point, this port is arranged at that

11:10:50  20  point.  They say this port is at zero degrees.  This port

11:10:53  21  is at 90 degrees.  It's not an array of degrees.  It's not

11:10:56  22  a space.  It's sa ingle point.

11:10:58  23          And so, arranged around is not a discussion of

11:11:03  24  the size of the ports.  It's their location of the ports,

11:11:06  25  and I think that up until this point, that has been

11:11:09  1  implicit in the briefings.  Remember again, both sides

11:11:12  2  embrace this chairs are arranged around a table.  That's

11:11:16  3  not a discussion of whether or not the chairs are big and

11:11:18  4  fat and curved, it's a discussion of point location.

11:11:22  5       But, again, going back to the claim language --

11:11:25  6  and I'm going to wrap up after this -- remember that is a

11:11:28  7  plurality of ports arranged around the central axis.  And

11:11:32  8  that is not just a discussion of the relationship between

11:11:36  9  the ports and the central axis but among the ports

11:11:39  10  themselves.  Just like the chairs are arranged around the

11:11:41  11  table based on their relationship with each other, the

11:11:45  12  same is true with these ports, and that's consistent

11:11:47  13  throughout the specification.

11:11:48  14       And they've totally eviscerated that requirement

11:11:51  15  there needs to be some association between the ports to

11:11:55  16  actually surround the central axis when they use a single

11:11:57  17  port to make a giant horseshoe to go all the way around

11:12:02  18  it.  Thank you, your Honor.

11:12:03  19       THE COURT:  Thank you.  The Court is going to

11:12:05  20  maintain its primary construction that the claim term

11:12:10  21  "arranged around a central axis" is not indefinite and

11:12:14  22  that no construction is necessary.

11:12:16  23       Next --

11:12:17  24       MR. GUARAGNA:  Thank you, your Honor.

11:12:18  25       THE COURT:  Next claim term is "alignment."

| | | |
|---|---|---|
| 11:12:20 | 1 | MR. TEPERA: I suppose they don't need to |
| 11:12:22 | 2 | respond, so you want me to go right now; is that correct? |
| 11:12:26 | 3 | THE COURT: You know, it's a little bit like when |
| 11:12:27 | 4 | I'm doing sentencing and I tell people I'm going to give |
| 11:12:31 | 5 | them time served, it would never help for them to -- |
| 11:12:35 | 6 | MR. GUARAGNA: Stand up. |
| 11:12:36 | 7 | THE COURT: -- stand up. So not that I'm saying |
| 11:12:41 | 8 | Mr. Guaragna deserves any time in jail. I'm just saying |
| 11:12:45 | 9 | you're always better off not getting up if you've won. |
| 11:12:50 | 10 | So on alignment. |
| 11:12:52 | 11 | MR. TEPERA: Thank you, your Honor. |
| 11:12:52 | 12 | Alignment is in claims 1 and 36. No construction |
| 11:12:56 | 13 | necessary is what plaintiffs have proposed, and the Court |
| 11:12:59 | 14 | has preliminarily agreed with that. It appears in the |
| 11:13:03 | 15 | last limitation of the independent claims where the ports |
| 11:13:07 | 16 | go in and out of alignment on the flowhead with those |
| 11:13:11 | 17 | ports that are in the flow restrictor, one or more of the |
| 11:13:16 | 18 | ports go in and out of alignment. |
| 11:13:17 | 19 | And the argument that we have here, I think, is |
| 11:13:19 | 20 | pretty simple is that we think there is an irreconcilable |
| 11:13:23 | 21 | tension in the intrinsic record on what it means to be |
| 11:13:26 | 22 | aligned. Dr. Noynaert points out that align can mean |
| 11:13:30 | 23 | different things in different contexts. With respect to |
| 11:13:32 | 24 | these tools, do you need -- is partial eclipse an |
| 11:13:35 | 25 | alignment? Or is it like a bolt and a nut where you need |

11:13:38  1   a hundred percent alignment?  And that's what we're trying

11:13:40  2   to figure out here.

11:13:41  3        Plaintiffs say, hey, the specification says

11:13:44  4   partial alignment equals alignment.  I think that's sort

11:13:46  5   of an inartful way, though, to say a partial eclipse

11:13:51  6   satisfies in this situation.  But what they -- what is

11:13:54  7   part of the intrinsic record and what a skilled artisan is

11:13:57  8   entitled to rely on when trying to understand the scope of

11:13:59  9   this patent is the prosecution history.  And the one

11:14:03  10  argument that's in the prosecution history is respect to

11:14:05  11  this art called Eddison.  It's a very similar device, all

11:14:09  12  claims are originally rejected over it, and it discloses

11:14:15  13  valves that go, quote, completely out of alignment, end

11:14:18  14  quote; and, in fact, it claims -- a claim related to that.

11:14:22  15  It says claims where fluid flow is interrupted -- where

11:14:25  16  the valve interrupts the flow of fluid.

11:14:30  17       And in response to the patent in suits

11:14:34  18  prosecution, the examiner even relies on that specific

11:14:38  19  line.  It's 924 through 26 in the third excerpt down there

11:14:42  20  to point out that, hey, Eddison discloses a pattern of at

11:14:46  21  least one interval where fluid flow is substantially

11:14:48  22  blocked by the flow restrictor and points to this

11:14:53  23  completely out of alignment language.

11:14:53  24       And what this implies is a range of opening and

11:14:57  25  closing of about zero to 90 percent, according to Dr.

11:15:02  1  Noynaert, who looks at the maximum overlap and looks like

11:15:05  2  about 90 percent. Zero percent completely out of

11:15:08  3  alignment is the other end of that range. Applicant says

11:15:11  4  that this doesn't meet the limitation of moving in and out

11:15:13  5  of alignment.

11:15:15  6          Impulse explains that away by saying the opposite

11:15:19  7  is true. Whereas we think that that means that they're

11:15:21  8  saying zero to 90 doesn't meet going in and out of

11:15:24  9  alignment, they say no, that the difference is on the

11:15:26  10  other side of the spectrum. It doesn't go down to zero.

11:15:30  11  I think it's important to say, there is evidence in there

11:15:33  12  that it doesn't go down to zero. There is evidence in

11:15:35  13  there that it does go down to zero. It discloses multiple

11:15:39  14  things, Eddison does. It discloses valves that completely

11:15:41  15  pinch off and those that don't pinch off.

11:15:44  16          And so, to argue that yes, there is evidence that

11:15:48  17  -- and the evidence that Impulse points to that it doesn't

11:15:52  18  totally pinch off is not consistent with the total

11:15:55  19  disclosure of Eddison. So one thing that we know is,

11:15:57  20  Eddison goes at least -- discloses at least zero to 90 and

11:16:01  21  some subset of that, as well. And so, if going zero to 90

11:16:07  22  percent isn't moving in and out of alignment and the

11:16:10  23  patent says partial alignment is alignment, those two

11:16:13  24  things are irreconcilable. Dr. Noynaert includes these

11:16:17  25  different valve designs below and asks, you know, apply

11:16:20  1  this definition, your understanding of alignment, to those

11:16:22  2  valves.  Do those move in and out of alignment?  And

11:16:24  3  depending on which definition you apply, the answer will

11:16:27  4  be yes or no, whether it's partial alignment or not.

11:16:29  5          And we cite Teva on that one because we think

11:16:32  6  it's an important post-Nautilus case on this sort of

11:16:37  7  thing.  It's molecular weight was the issue there.  But in

11:16:41  8  the prosecution history, not just that that patent-in-suit

11:16:43  9  in Teva but that patent family, related patents to it,

11:16:48  10  different definitions of molecular weight were described

11:16:51  11  and they're wholly irreconcilable.  And that's what Teva's

11:16:54  12  standing for is, if the claim term is not fixed to a

11:16:57  13  skilled artisan -- and this is one that's not -- there's

11:16:59  14  different reasons alignment can be important in different

11:17:02  15  contexts -- and the claim doesn't inform which one to

11:17:05  16  choose and the prosecution history shows irreconcilable

11:17:08  17  differences, then the claim is indefinite.  It doesn't

11:17:12  18  inform with reasonable certainty.

11:17:16  19          THE COURT:  Thank you.

11:17:19  20          Mr. Guaragna, are you handling this?

11:17:22  21          MR. GUARAGNA:  Yes, sir.

11:17:22  22          THE COURT:  If you would like to, I think the

11:17:24  23  only thing I really need for you to address is the

11:17:29  24  arguments counsel made with respect to Eddison.

11:17:32  25          MR. GUARAGNA:  Yes, your Honor.

11:17:33  1          THE COURT:  And Eddison, for the court reporter,

11:17:36  2    is, I think, unusually spelled, which is, E-D-D-I-S-O-N.

11:17:41  3    Not like Thomas Edison, but it has an extra D.

11:17:45  4          MR. GUARAGNA:  Correct, your Honor.

11:17:47  5          I'm going to flip to slide 40.  So, your Honor, I

11:18:04  6    think defendants have misstated the impact of Eddison and

11:18:08  7    I'll explain why.  So we're looking at slide No. 40, if

11:18:11  8    you look at what the patentee actually said about Eddison,

11:18:13  9    you'll see that Rubicon left out a critical word when

11:18:16  10   quoting the office action response.

11:18:18  11          The applicant noted that the ports in Eddison

11:18:21  12   were always in alignment, meaning there was always some

11:18:24  13   overlap of the ports, and that's how they were

11:18:26  14   distinguishing it, which is entirely consistent with the

11:18:28  15   idea that those cannot move into and out of alignment.  So

11:18:33  16   in that sense, it's entirely consistent with how the

11:18:36  17   patentee views the meaning of alignment in the 584 patent.

11:18:42  18   So that's the first points, your Honor.

11:18:43  19          Second point is, if we're looking at what the

11:18:48  20   patentee said, that's what the key critical issue is here.

11:18:51  21   It's not necessarily what, in fact, this might actually

11:18:53  22   teach or how the words are used in this particular

11:18:56  23   reference, but the patentee was distinguishing it based on

11:19:01  24   the fact that those ports always coincided, and that's the

11:19:04  25   key distinction.

11:19:06 1        The next slide, slide 41, actually shows that in

11:19:11 2   addition to being a distinguishing factor that the

11:19:14 3   applicant made, that their view of the Eddison reference

11:19:18 4   is actually correct.  So if you look at the table

11:19:21 5   referenced on slide 41, to the left, and this is figure 5

11:19:25 6   in Eddison, you'll see that in the center column, the

11:19:30 7   angles go from zero all the way to 360, and at each -- the

11:19:34 8   beginning and the end point, there is still some

11:19:36 9   coincidence.  There is still some amount of overlap within

11:19:39 10  those ports, which suggest that, in fact, the applicant's

11:19:44 11  reading of that reference was entirely consistent with the

11:19:47 12  584 patent.

11:19:48 13       THE COURT:  Counsel, is there anything you'd like

11:19:50 14  to say in response to that with regard to Eddison?

11:19:53 15       MR. TEPERA:  Your Honor, I'd just like to

11:19:57 16  highlight that that -- I think it is important that this

11:19:59 17  is not what the patentee pointed to, the evidence on

11:20:05 18  figure 5 and figure 6.  And the chart that was

11:20:08 19  accompanying figure 5 is not what he pointed to when

11:20:11 20  actually trying to distinguish.  It was just relying on

11:20:14 21  that one phrase about the assembly, that these things

11:20:16 22  always coincide.  And what we're trying to do today is

11:20:19 23  infer what he means by coincide.  A single word to mean

11:20:23 24  that something contrary to what the rest of the

11:20:25 25  specification spells out, which is that they do, in, fact,

11:20:28  1  move completely out of alignment.  And I don't think that

11:20:30  2  that single word carries that clear of an explanation of

11:20:33  3  that's what the patentee intended here.

11:20:36  4          Thank you, your Honor.

11:20:37  5          THE COURT:  The Court is going to maintain its

11:20:39  6  preliminary construction and find that the claim term

11:20:44  7  "alignment" is not indefinite, and it will have its plain

11:20:48  8  and ordinary meaning.

11:20:48  9          The final -- I think it's the final but tell me

11:20:51  10  if I'm wrong -- is the final "wherein the fluid flow is

11:20:59  11  substantially blocked by the flow restrictor."  Is that

11:21:01  12  our last?

11:21:02  13          MR. TEPERA:  Yes, your Honor.

11:21:03  14          THE COURT:  Okay.  Let me say that a little more

11:21:04  15  slowly for the court reporter.  Wherein the fluid flow is

11:21:09  16  substantially blocked by the flow restrictor.  Did that

11:21:14  17  come out right, restrictor?

11:21:18  18          MR. TEPERA:  Your Honor, we have this presented

11:21:19  19  as an indefiniteness argument, and we tried to do a little

11:21:24  20  discussion with counsel beforehand.  We are okay, I think,

11:21:27  21  with no construction necessary on this particular term so

11:21:31  22  long as similar to the polyrhythmic, this might be

11:21:34  23  something that's better brought up later.

11:21:36  24          But we want there to be the understanding that is

11:21:38  25  embraced by Impulse's own expert when he says what this

11:21:43  1  describes is complete blockage but for minimal leakage.

11:21:48  2  Because of the realty of implementation of this thing,

11:21:52  3  you're putting together a couple of valves.  We understand

11:21:54  4  we don't work in this theoretical world.  There might be a

11:21:57  5  little bit of leakage.  But there is an attempt to have

11:21:58  6  complete blockage.  This is that enhanced version of

11:22:02  7  polyrhythmic behavior that was showing throughout the

11:22:04  8  plurality of time intervals, amplitudes and

11:22:09  9  enhance-through complete blockage.  And so long as

11:22:11  10  substantially means that, we're okay.

11:22:12  11       THE COURT:  I think the Court's going to

11:22:14  12  understand what the word "substantially" means here.

11:22:17  13       MR. TEPERA:  Okay.

11:22:18  14       THE COURT:  And, again, it's one of those I don't

11:22:21  15  think it's indefinite.  I don't think it's very difficult

11:22:23  16  for the Court to come up with a better word than

11:22:27  17  "substantially."  We could come up with a different word,

11:22:29  18  but it would just mean substantially.  But down the road,

11:22:34  19  if -- when you're defending the case, if you think the

11:22:38  20  plaintiff's expert's taking a position on infringement

11:22:41  21  that is not correctly utilizing the word "substantially"

11:22:47  22  for some reason or is applying it in way that you think is

11:22:51  23  inconsistent with what you think I would think is meant by

11:22:55  24  that, then file a motion, whatever motion is most

11:22:59  25  effective to bring that to our attention, and I think we

11:23:02  1  could take that up at that time.

11:23:03  2          MR. TEPERA:  Thank you, your Honor.  Can I

11:23:04  3  address one more point on that, at least to the --

11:23:05  4          THE COURT:  Sure.  You can address whatever you'd

11:23:09  5  like.

11:23:09  6          MR. TEPERA:  There is a real impact of this, and

11:23:11  7  it's different from a lot of the cases in which

11:23:14  8  substantially is -- has been construed as perfectly fine

11:23:20  9  is because approximately works in a lot of those sorts of

11:23:24  10  cases.  This is a case where tools vary based on very

11:23:27  11  small differences in their overlap, and there are exact

11:23:30  12  design points that people go for.

11:23:32  13          And, in fact, the patent-in-suit, we think, kind

11:23:35  14  of recognizes that itself where it has figure 14 where

11:23:39  15  they say, you know what, there's a lot of times where you

11:23:41  16  want to have some small, continued fluid flow, so we're

11:23:44  17  going to have that interior port.  And there are times

11:23:48  18  where you want to maximize the pressure pulse.  You want

11:23:51  19  to have zero fluid flow.

11:23:54  20          And so, that's why approximately doesn't really

11:23:57  21  get here and that's why we want to really understand that

11:23:59  22  you're talking about a 98 percent closed valve versus a

11:24:03  23  hundred percent closed valve really end up being two

11:24:06  24  different tools defined by two different design

11:24:09  25  specifications there.

11:24:10 1          THE COURT:  I understand.

11:24:11 2          MR. TEPERA:  Thank you.  And with that, I'll sit

11:24:14 3 down.  Thank you, your Honor.

11:24:15 4          THE COURT:  That's it.  Okay.

11:24:18 5          I should know this, but I don't.  Has this case

11:24:21 6 been set for trial?

11:24:24 7          MR. GUARAGNA:  Your Honor, actually, I was hoping

11:24:26 8 to address that, if we could.

11:24:28 9          THE COURT:  If it hasn't been set, then yes, we

11:24:31 10 need to address it.

11:24:32 11          MR. GUARAGNA:  I've got the Court's scheduling

11:24:36 12 order up on the Elmo, or I should here in a second.

11:24:39 13          THE COURT:  And let me ask you all this.  Is this

11:24:42 14 a Waco or an Austin case?

11:24:46 15          MR. NASH:  This is a Waco case, I believe, your

11:24:50 16 Honor.  We'd be happy to try it here in Austin if

11:24:55 17 everybody would prefer.

11:24:57 18          MR. GUARAGNA:  We'll confer with our client on

11:24:59 19 that, your Honor.

11:24:59 20          THE COURT:  Well, seriously.  Confer with your

11:25:01 21 client and if your client is okay, I don't care.  I mean,

11:25:05 22 we have a situation where both lawyers are from Austin.

11:25:09 23 And so, if you want to try it here.  I understand -- I

11:25:13 24 continue to not -- I continue to believe that if I were in

11:25:16 25 either of your chairs, I don't know where it would be

11:25:19 1 better to try between Austin and Waco.

11:25:21 2 That being said, you're both from Austin. If you

11:25:24 3 want to try it here, we can try it here. If the plaintiff

11:25:28 4 -- you filed it in Waco. If you want to file it in Waco,

11:25:30 5 we'll try it in Waco. I wasn't intimating a feeling

11:25:34 6 either way. It's just that that's an option. If you all

11:25:37 7 want to do it here, I would certainly do it.

11:25:40 8 MR. GUARAGNA: We appreciate that, your Honor.

11:25:41 9 We will confer with our client and with counsel.

11:25:44 10 MR. NASH: Yes, your Honor.

11:25:45 11 MR. GUARAGNA: So the question I wanted to ask

11:25:47 12 your Honor because I cannot remember. We didn't confer

11:25:49 13 about this and it's really not a change in anything, but I

11:25:51 14 didn't know whether the dates that we had submitted were

11:25:54 15 actually confirmed to be clear on the Court's calendar.

11:25:57 16 So what I wanted to do, hopefully today, was to make sure

11:26:00 17 that these dates which we have inserted in our scheduling

11:26:03 18 order, we actually put dates in. But we also note that

11:26:06 19 the Court would set this at the Markman hearing.

11:26:09 20 So I wanted to just double check to make sure

11:26:11 21 that we were all in agreement as to whether the pretrial

11:26:13 22 conference would go forward on January the 28th with the

11:26:15 23 trial following on February the 1st and if that was what

11:26:19 24 the Court had down, as well.

11:26:21 25 THE COURT: I don't.

11:26:23　1　　　　　MR. NASH:  I think we put this in based on the

11:26:25　2　model order.  So.

11:26:26　3　　　　　THE COURT:  I think there is a chance I may be

11:26:30　4　doing something not court-related in February that might

11:26:35　5　interfere with this, but I think Josh told me last night

11:26:39　6　that we are not in peril of not being able to get you a

11:26:43　7　trial in the either January or March time of next year.

11:26:49　8　So I would not, at the moment, count on going in February.

11:26:54　9　　　　　But you all let me know if January's too soon.

11:26:58　10　That's fine.  If March is fine, let us know, and we'll get

11:27:03　11　it on the docket.

11:27:07　12　　　　　MR. NASH:  Okay.  We'll confer after this and get

11:27:09　13　back to your Honor with Josh.

11:27:10　14　　　　　THE COURT:  Probably whatever works for you guys

11:27:12　15　in March would work for us, I think.  So just y'all get a

11:27:15　16　date.  It doesn't seem to me like this would take much

11:27:18　17　more than a week to try.

11:27:20　18　　　　　MR. GUARAGNA:  I agree, your Honor.

11:27:21　19　　　　　THE COURT:  Okay.

11:27:22　20　　　　　MR. NASH:  Just one patent.

11:27:24　21　　　　　THE COURT:  And as you guys -- I'm assuming no,

11:27:25　22　but I'll go ahead and put on the record, wherever you try

11:27:30　23　it, the magistrate judge will be picking the jury the

11:27:34　24　Thursday or Friday before.  The upside to you all, as you

11:27:39　25　know, is that you get a lot -- you get a much better

11:27:42 1   judge, and you get 45 minutes or so per side, in addition

11:27:48 2   to what he does to pick the jury. And then, when we

11:27:52 3   started on the Monday morning of trial, we would start

11:27:54 4   with opening arguments. So you all would have already

11:27:57 5   picked the jury.

11:27:58 6         So whatever date you were saying -- so you have

11:28:02 7   jury selection/trial, actually, jury selection -- trial

11:28:06 8   would be on X date on a Monday. Jury selection will be a

11:28:10 9   click before that on Thursday or Friday.

11:28:14 10        MR. NASH: I understand, your Honor.

11:28:16 11        THE COURT: They've got great magistrates here in

11:28:18 12   Austin, too, so no matter where you do it, you'll have a

11:28:20 13   great voir dire.

11:28:21 14        MR. GUARAGNA: And I didn't get a chance to

11:28:23 15   correct the record, your Honor, but for the derogatory

11:28:25 16   comments that your Honor made about yourself, I don't

11:28:28 17   agree with them.

11:28:29 18        THE COURT: I thought it was Mr. Nash that made

11:28:31 19   them.

11:28:32 20        MR. NASH: Just let the record reflect I did not

11:28:34 21   make those comments, but I do appreciate the comments

11:28:36 22   about my beard.

11:28:36 23        THE COURT: Your beard's great. It's great.

11:28:41 24        MR. NASH: Thank you.

11:28:41 25        THE COURT: In fact, I just realized Mr. Guaragna

11:28:45 1    no longer has a beard; that's why you look so young today.

11:28:50 2            MR. GUARAGNA:  You can take the man out of the

11:28:51 3    Navy, your Honor.

11:28:52 4            THE COURT:  It hit me, you had changed and look

11:28:55 5    ten years younger and it's -- but Mr. Nash looks ten years

11:29:00 6    younger with a beard.  That's what's amazing.

11:29:03 7            So gentlemen, again, this is the best job in the

11:29:07 8    world because it's just great lawyers doing a great job.

11:29:11 9    I appreciate your briefing and the arguments today.  You

11:29:18 10   took up -- you gave us, literally, something to talk about

11:29:20 11   for three full hours driving up from Houston last night.

11:29:24 12   I appreciate that.  Who would have thought cyclic or

11:29:27 13   cyclic would be so interesting.

11:29:29 14           MR. GUARAGNA:  I think we can both agree, your

11:29:31 15   Honor, we appreciate the investment that you and your team

11:29:33 16   put into it.

11:29:33 17           THE COURT:  Well, mostly the team.  I have

11:29:36 18   three -- the three best clerks in the world.  Not that

11:29:41 19   Judge Nowlin's clerk isn't great, too.  Y'all have a great

11:29:45 20   weekend.

21           (End of proceedings.)

22

23

24

25

1              * * * * * *

2

3

4    UNITED STATES DISTRICT COURT  )

5    WESTERN DISTRICT OF TEXAS)

6

7       I, LILY I. REZNIK, Certified Realtime Reporter,

8    Registered Merit Reporter, in my capacity as Official

9    Court Reporter of the United States District Court,

10   Western District of Texas, do certify that the foregoing

11   is a correct transcript from the record of proceedings in

12   the above-entitled matter.

13      I certify that the transcript fees and format comply

14   with those prescribed by the Court and Judicial Conference

15   of the United States.

16      WITNESS MY OFFICIAL HAND this the 23rd day of March,

17   2020.

18

19

20                            /s/Lily I. Reznik
                              LILY I. REZNIK, CRR, RMR
21                            Official Court Reporter
                              United States District Court
22                            Austin Division
                              501 W. 5th Street,
23                            Suite 4153
                              Austin, Texas 78701
24                            (512)391-8792
                              Certification No. 4481
25                            Expires:  1-31-21